UPON A REHEARING EN BANC
RUDOLPH BUMGARDNER, III, Judge.
A jury convicted Merry Christine Pease of second degree murder and use of a firearm during the murder of her husband, Dennis Pease. The defendant contends the trial placed her in double jeopardy, the substitute prosecutor had a personal interest in the outcome of the case, and the evidence *347 was insufficient to convict. A panel of this Court held the defendant was not placed twice in jeopardy nor was the substitute prosecutor disqualified, but it held the evidence was insufficient and reversed the convictions. We granted a petition for rehearing en banc and stayed the mandate of the panel decision. Upon rehearing en banc, we affirm the trial court.
In August 1994, a jury convicted the defendant of the murder of her husband. This Court reversed the conviction because the Commonwealth’s Attorney examined a witness during her appearance before the grand jury and influenced the grand jury in returning the indictment. Pease v. Commonwealth, 24 Va.App. 397, 400, 482 S.E.2d 851, 852 (1997).
On remand, the trial judge appointed substitute Commonwealth’s attorneys, Code § 19.2-155, and a new grand jury re-indicted. Those prosecutors moved to nolle prosequi the indictments because they received a report of the medical examiner that ruled the death a suicide. The substitute Commonwealth’s attorneys did not have the report when they re-indicted, and it was not in the files received from the first prosecutor. The trial judge granted the motion.
Several months later, the trial judge appointed Timothy McAfee, the Commonwealth’s Attorney at the first trial, substitute Commonwealth’s attorney. A grand jury indicted the defendant for the third time. The defendant moved to dismiss the indictments because of prosecutorial misconduct at the first trial and because the substitute Commonwealth’s attorney had conflicts of interest. The trial judge denied the motions.
“It has long been settled ... that the Double Jeopardy Clause’s general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction.” Lockhart v. Nelson, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). The defendant argues that double jeopardy bars her retrial *348 because the prosecutor’s misconduct caused reversal of the first conviction. “Only where the governmental conduct in question is intended to ‘goad’ the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.” Oregon v. Kennedy, 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Kennedy rejected an attempt “to broaden the test from one of intent to provoke a motion for a mistrial to a more generalized standard of ‘bad faith conduct’ or ‘harassment’ on the part of the ... prosecutor.” Id. at 674, 102 S.Ct. 2083.
In this case, the Commonwealth’s Attorney violated statutory criminal procedure by questioning a witness during her grand jury appearance. As the trial judge found, the misconduct was not an instance in which the “prosecutor was trying this case and got to a certain point and thought he was going to lose it.” The record reflects nothing to indicate the prosecutor intended to delay the trial or to goad the defendant into asking for a mistrial. “Without the requisite intent, however, gross prosecutorial misconduct will not satisfy the exception set forth in Kennedy.” Robinson v. Commonwealth, 17 Va.App. 551, 555, 439 S.E.2d 622, 625 (1994). Accordingly, we hold the trial court correctly denied the motion to bar retrial.
The defendant argues that the substitute Commonwealth’s attorney, Timothy McAfee, had a personal interest in the outcome of the second trial. She asserts that when the trial judge appointed him as substitute Commonwealth’s attorney, McAfee had two ethical complaints against him pending from the first trial. She contends that he could not be impartial and the trial judge erred in not dismissing the' indictment.
The Virginia State Bar was investigating two complaints arising from McAfee’s conduct during the first trial: improper communication with the first grand jury, and withholding a medical examiner’s report indicating the victim committed suicide. After a full hearing on the motion to dismiss for *349 prosecutorial misconduct, the trial court noted that McAfee had been a federal prosecutor and “mixed the federal with the state grand jury situations.” It found that it was just as probable as not that the medical examiner’s report was a part of the documents received by McAfee from the medical examiner. It did not find McAfee withheld the report from the materials furnished the defense.
The trial court concluded that McAfee was not retaliating, had no reason to be vindictive, and demonstrated the ability to be fair, impartial, and objective. The trial judge determined that McAfee had no “personal interest in the outcome of [the] case” and no actual bias to bar his participation as the prosecutor.
“A special prosecutor appointed by the trial judge steps into the role of public prosecutor and necessarily accepts that duty of impartiality.” Adkins v. Commonwealth, 26 Va.App. 14, 19, 492 S.E.2d 833, 835 (1997). The record supports the trial court’s ruling that the special Commonwealth’s attorney was impartial. Accordingly, we affirm the ruling.
Dennis Pease, the defendant’s husband, was killed by two gunshots fired within an inch of his chest. The Commonwealth maintains his death was murder; the defendant asserts it was suicide. It was one or the other. The Commonwealth postulated that the defendant shot her husband in the bedroom during an argument, that he walked into the living room and collapsed on the floor where the defendant shot him a second time, and that she then shot herself while in the kitchen to disguise the murder.
The defendant postulated that the victim shot the defendant, firing at her from the bedroom door down the hall toward the kitchen. The defendant escaped and ran from the trailer. When he saw that she had run to a neighbor’s house, the victim shot himself with the bullet passing through his lung and into the kitchen coming to rest in the ironing board. The victim then went into the bedroom where he began *350 bleeding. From there he trailed blood into the living room where he shot himself a second time through the heart.
The two opposing theories derive from the physical evidence at the scene, the forensic analysis of that evidence, and the statements that the defendant made during the investigation. The defendant maintains the evidence was insufficient to exclude her theory of the evidence and to support the verdict of guilty. Dowden v. Commonwealth, 260 Va. 459, 467, 536 S.E.2d 437, 441 (2000), reiterated the precepts of appellate review of this issue:
Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it ____Additionally, when a defendant challenges the sufficiency of the evidence, [i]f there is evidence to sustain the verdict, this Court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury.
(Citations and internal quotations omitted).
About 4:00 p.m., November 18, 1993, the defendant appeared at her neighbor’s house, and stated, “I have been shot. Help me.” The neighbor, a law enforcement officer, observed a gunshot wound that completely penetrated her abdomen. He saw a powder burn on her sweatshirt and a powder burn on her right hand that ran from her wrist to the first knuckle of her little finger. The defendant explained that she and her husband were arguing, and he went into the bedroom. When she knocked on the door to get him to come out, he jerked the door open, and shot her at very close range. “He just shot me and I ran.” When asked, she specifically denied having touched the gun. When asked how she got the powder burn on her hand, she tried to rub it off with a washcloth.
At the neighbor’s house, the defendant displayed no apprehension that her husband might pursue her. She exhibited no *351 visible injuries other than the wound to her abdomen. The defendant stated she “did it all for Chris and Ketzie [her children from a prior marriage],” and “I’m all that Chris and Ketzie have now.” As she left for the hospital, she said, “I may have heard another shot. I am not sure.”
When police and sheriffs deputies went to the defendant’s trailer, they found the victim sprawled across the living room floor lying in a pool of his blood, dead. In his left hand was a blood soaked rag; near the other was a pistol. Both of the victim’s hands were bloody, but his palm carried no impression from the pistol grip. No blood was on the gun.
A path of blood led from the body, to the kitchen, past an overturned chair, and through the hall into the master bedroom. That bedroom was in shambles. The blinds and curtains were pulled from the window and strewn across the room. The bed covers including a red sheet were pulled off, and feathers from a ripped open pillow covered everything. Before disturbing the scene, investigators made a video recording and took extensive photographs throughout the trailer. These were presented at trial, and the witnesses used them extensively as visual aids to describe, define, and clarify their testimony.
The pistol on the living room floor was a .357 caliber revolver that contained three expended cartridges. Investigators located two bullets during the initial investigation. One remained in the victim barely penetrating the skin of his back. A second bullet lodged in an ironing board in the laundry room behind the kitchen. It penetrated the kitchen wall on a slightly downward trajectory 45 inches above the floor and passed through a box of detergent before coming to rest.
The investigators could not find the third bullet though they searched the trailer for two days. They searched for it most extensively along a path running from the bedroom door, where the defendant said her husband had fired it, down the hallway through the kitchen. They found no bullet, hole, or other trace of it. They also found no hole that the third bullet may have caused anywhere in the structure or its furnishings. *352 Four different officers testified affirmatively that it was not in the windowsill of the kitchen window. The bullet was not produced until about two weeks later.
Two weeks after the homicide, the chief investigator informed the defendant that the sheriffs office could not rule the death a suicide because they “have got a missing bullet, the one you was shot with and, you kno w, we can’t find it.” A few days later the defendant called the investigator and informed him that she had located the bullet. He returned to the defendant’s trailer, and the defendant took him to the kitchen, moved the curtain at the window, and showed him a .38 caliber bullet. The bullet was “lying ... in the sill like it had never been moved.” Later analysis revealed a single red thread was attached to it.
Laboratory analysis of the physical evidence established that the decedent had been shot twice in the chest from a maximum distance of one inch. The defendant had been shot from the same range. All three shots came from the revolver recovered from the living room. No discernible fingerprints appeared on the gun, and it gave no indication that it had been wiped clean.
The autopsy report described the wounds and the paths of the bullets through the victim’s body. Both entered his front chest. One penetrated the right lung and exited the body. The other penetrated the heart but did not exit. Either wound was lethal, but the bullet through the lung most likely would not cause death for several minutes. The bullet through the heart caused death almost immediately. If the bullet through the lung were the first shot, the victim would have been capable of inflicting both wounds. The wounds to the victim “could be self inflicted or inflicted by someone else.”
The Commonwealth presented extensive testimony from forensic experts that explained and interpreted the physical evidence found at the scene. The gunshot residue analysis could not determine whether the defendant or the victim had fired the gun. The victim had primer residue on both hands. The defendant had primer residue on her face and right hand, *353 and she had “particles that were indicative of primer residue on her left hand.”
An expert in firearms stated the muzzle of the revolver was “at or near contact” when it discharged into the defendant. To deposit gunpowder on a person’s hand the hand would have to be less than one inch from the gun. Touching a gun when it was not being fired would not leave a powder burn.
A blood stain and spatter analysis interpreted the blood found at the scene. A single trail of the victim’s blood began in the bedroom. It ran down the hall, through the kitchen, and into the living room. Nothing suggested more than one trail of blood. The victim had stepped in his blood between the kitchen and the living room and then transferred it to the carpet as he moved into the living room.
The defendant called the medical examiner to explain that a person with a wound through the lung most likely would live for a few minutes but could survive for several hours. The medical examiner was not able to conclude when the blood started to flow from the wound to the lung. It was possible for someone to walk twelve to fifteen feet after being shot without dripping any blood on the floor. It was also possible to walk that distance, pull blinds and curtains off the bedroom wall, walk another twenty feet into the living room, and inflict a second gunshot wound.
The Commonwealth presented evidence of the defendant’s statements and remarks made over the course of the investigation. The subsequent explanations varied from those made initially to her neighbor. At the hospital while she was still in the emergency room, the defendant stated she walked away from the bedroom door into the kitchen. She was standing near a chair beside the kitchen table when the husband opened the bedroom door and shot her. He was from five to eight feet from her when he shot. He then came towards her and brandished the pistol. She struck it with her right hand and begged him not to kill her. She jerked away and ran to neighbors.
*354 The next morning, the defendant said she and her husband were arguing about money. He went to her car and did something to it. He returned and locked himself in the master bedroom. She went to the door and demanded to know what he had done to her car. He opened the door, shot her, but then caught her in the kitchen. She hit his gun hand without touching the gun and ran out the front door. She thought she heard another shot as she ran off the porch. About two weeks later, the defendant said the argument was over her not spending more time with him, and they had discussed getting a divorce. That time, she denied hearing any shots after she left the house.
Two other incidents suggested that the defendant was present after the victim was shot and that she lacked remorse. She was present during interrogation of the deputy chief medical examiner. When asked whether the victim would have been in pain after the first shot, the defendant interjected, “a lot.” Another time during the investigation, witnesses described her as laughing and giggling as she viewed the photographs of her dead husband on the floor of the trailer.
From the evidence presented, the jury must determine credibility and the weight of that which it finds as true. “ ‘The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide.’ ” Cantrell v. Commonwealth, 7 Va.App. 269, 290, 373 S.E.2d 328, 339 (1988) (quoting Bridgeman v. Commonwealth, 3 Va.App. 523, 528, 351 S.E.2d 598, 601 (1986)).
After determining credibility and assessing the weight of the testimony, the jury must ascertain what reasonable inferences arise from the facts they found proven by that testimony. “ ‘[W]hat inferences are to be drawn from proved facts is within the province of the jury....’” Id. (quoting Higginbotham v. Commonwealth, 216 Va. 349, 353, 218 S.E.2d 534, 537 (1975)). If alternative inferences are possible, the jury resolves the differences and determines which inferences are reasonably drawn. “[T]he jury must use its experience *355 with people and events in weighing the probabilities.” Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The trier of fact has the responsibility “to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Finally, the jury decides if the proven facts, and the reasonable inferences drawn from them, establish guilt beyond a reasonable doubt. If so, the jury, as instructed, convicts. If the jury decides that a theory of innocence remains and the theory is reasonable, it, as instructed, acquits. “Whether an alternative hypothesis of innocence is reasonable is a question of fact....” Archer v. Commonwealth, 26 Va.App. 1, 12, 492 S.E.2d 826, 832 (1997).
On appeal, we review the jury’s decision to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision. “[I]f there is evidence to sustain the verdict, this Court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury.” Dowden, 260 Va. at 467, 536 S.E.2d at 441 (citations and internal quotations omitted).
Three shots were fired and inflicted three distinct wounds: two to the victim, one to the defendant. The person who fired the shot through the victim’s lung fired the shot through his heart. Both sides agree to that inference. The person who fired those two shots could have been the victim or the defendant.
The shot through the victim’s heart was fired in the living room where the bullet remained lodged in him. Both sides agree to that inference. The place where the other two bullets were discharged is not so easily fixed. Tangible damage does not record the path of the bullet found in the windowsill, and the Commonwealth and the defense do not agree about it. However, they do agree that the same bullet could not have hit both the victim and the defendant.
*356 The path of the bullet into the ironing board was exactly opposite to the path of a bullet found in the windowsill: the former going from right to left when facing the trailer and the latter going from left to right. The location of the bullet in the windowsill was approximately in the same plane as that formed by the wall between the kitchen and the laundry room. If the ironing-board-bullet struck the defendant, the victim did not fire a shot from the bedroom door, down the hall, and into her as she claimed.
Before the jury scrutinized the evidence, theoretically either bullet could have hit either person. The ironing-board-bullet or the windowsill-bullet could have hit the victim or the defendant. But, once the believable evidence links one of the two bullets to one of the two persons shot, the other bullet must be linked to the other person shot. Defining whom the ironing-board-bullet struck defines whom the windowsill-bullet struck. If the bullet in the ironing board passed through the victim’s lung, then the bullet in the windowsill hit the defendant. If the ironing-board-bullet passed through the defendant, then the windowsill-bullet penetrated the victim’s lung. The possible explanations were mutually exclusive.
Defining which bullet struck which person defines whether the homicide is murder or suicide. The victim committed suicide if the ironing-board-bullet hit him or if the windowsill-bullet hit the defendant. Conversely, the defendant committed murder if the ironing-board-bullet hit her or if the windowsill-bullet hit the victim. When evidence establishes the truth or falsity of any one of the alternatives, it resolves the truth or falsity of all possibilities. In doing so, it resolves the guilt or innocence of the defendant beyond a reasonable doubt.
The jury resolved the issue of whether a bullet passed from the bedroom door, through the defendant, and landed in the windowsill. The verdict reflects the jury’s decision to disbelieve the defendant’s story. Four witnesses stated unequivocally that the sill contained no bullet the night of the shootings. The bullet suspiciously appeared after the investigator told the defendant he would not rule the death a suicide *357 without it. Other evidence contributed to make the defendant’s story unlikely. According to the defendant, the bullet traveled a maximum distance of six to eight feet and landed at nearly a right angle to the initial axis of flight. It landed in the corner of the windowsill closest to the point of discharge, but it was so spent it dropped onto the sill without breaking the window, marking the sill, or tearing the curtains that covered the window.
In deciding to disbelieve the defendant’s claim she found the bullet, the jury would have considered and evaluated her other statements and conduct. From her first statement to her neighbor, she gave stories incompatible with irrefutable physical facts. She claimed she had never touched the gun, but she had a large powder burn on her hand, which she tried to wash off. The defendant maintained she was six to eight feet from the gun when shot, but the residue on her sweatshirt established the gun was within one inch of her when it discharged. She claimed she left the trailer before the victim was shot, but she made remarks that indicated otherwise.
The jury was entitled to evaluate the reasonableness of the defendant’s story. “Moreover, the jury was not required to believe the defendant’s explanation, and if that explanation is not believed, the jury may infer that the accused is lying to conceal his guilt.” Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d. 608, 610 (1981) The jurors did not believe the bullet landed in the windowsill where the defendant said she found it. If that basic fact was not true, it was not reasonable to infer the ultimate fact that the shot was fired from the bedroom door, through the defendant, and onto the windowsill. Having found the defendant lied, reasonable jurors could infer that she found the bullet elsewhere in the trailer and planted it in the windowsill hoping to bolster her story that she was shot by the victim. Such decisions were neither arbitrary nor capricious, but the very essence of trial by jury.
The physical evidence permits a reasonable conclusion that the defendant shot herself and was not shot by the victim. *358 The ironing-board-bullet penetrated the wall 45 inches from the floor, the exact height of the entrance wound to the defendant. The jury used its experience with people and events in weighing the probabilities of the defendant’s story: that the victim decided to shoot the defendant during their argument; that he found the defendant’s gun, hidden where she did not expect him to find it; and that he used it rather than his own pistol, which was loaded and readily available. The jury also assessed the probability that the victim, after shooting the defendant once, let her flee from his grasp without firing a second time.
The jury determined it was not reasonable to believe the victim first shot himself in the lung, then walked to the bedroom without bleeding where he tore the room apart, and then walked back to the living room before shooting himself the second time. The victim dripped blood from the bedroom, to the kitchen, to the living room. The trail began next to the dresser under which the defendant had hidden her gun. It inexorably records his path of weakening capacity and diminishing consciousness from the bedroom into the living room where the fatal shot penetrated his heart. The jury assessed the demonstration of the way the victim had to hold the gun to inflict the first wound. The victim was right-handed. The shot entered near the nipple passing from right of center up and outward. The victim had emergency medical training and knew where his heart was. The lung shot would have required a conscious contortion to avoid the heart.
The jury also assessed whether it was reasonable to believe the victim could walk dripping the trail of blood shown in the exhibits without getting blood on his right hand. The gun had no blood or fingerprints on it, and the victim’s right palm had no imprint from the pistol grip. An investigator testified he expected to find blood on the victim’s hand because of the way he had dripped blood. The jury assessed whether that was reasonable in light of specific testimony the victim’s palm contained blood distinctive from the type coughed from his mouth and nose as he lay dying.
*359 The jurors assessed whether it was reasonable to infer that the defendant was present when the victim was shot. The defendant fled from the trailer but was not afraid the victim pursued her. The defendant made statements that indicated she knew he was dead. She knew the victim was in pain from the lung shot. A blood-spatter expert found no indication that a smear of blood on the victim’s back could have been made by him. One strand of the defendant’s hair was trapped in the blood coughed up by the victim as he lay on the floor dying. The defendant was able to find the third bullet when no one else could.
The defendant argues in her brief that if an item of evidence is susceptible of two interpretations, the jury cannot rely on it to convict unless the Commonwealth shows the defendant’s interpretation is impossible. That is, if another explanation is possible, the Commonwealth must exclude the possibility. It is a review of the facts we rejected in Cantrell.
The defendant’s argument misapplies the requirement that the Commonwealth must exclude every reasonable hypothesis of innocence. The defendant applies the maxim to each individual item of evidence. If the defense offers a possible explanation for the item, the Commonwealth fails to exclude every reasonable hypothesis of innocence unless it shows the defendant’s possible explanation is impossible. “We place too great a burden on the Commonwealth if we require it to exclude every possible theory or surmise presented by the defense.” Black, 222 Va. at 841, 284 S.E.2d at 609.
For example, the defendant argues no inference can be drawn against her from the fact she had a large powder burn on her hand. The defendant maintained that shooting herself could not have made the particular shape of burn she received. She argued the evidence indicated that she could have received that burn by placing her hand just above the entrance wound as the gun fired into her. The Commonwealth maintained it was made by holding the gun while shooting herself. Both sides punctuated the testimony supporting their interpretations of this item of evidence with demonstrations. The *360 jury had those demonstrations in mind while assessing whether the defendant’s interpretation was reasonable under all the related facts and circumstances. On appeal we grant the inference favorable to the Commonwealth if it is reasonable. The record on appeal does not provide those demonstrations that give integral definition of the spoken word. However, the record does not require that we find it unreasonable to reject the defendant’s theory and accept the Commonwealth’s theory. Accordingly, an adverse inference could be drawn from the powder burn and the powder burn was a circumstance the jury could consider when deciding guilt.
The statement that circumstantial evidence must exclude every reasonable hypothesis of guilt is an alternative way of stating the fundamental precept that the Commonwealth has the burden to prove each element of an offense beyond a reasonable doubt. It reiterates “the standard applicable to every criminal case.” Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); see Holland, 348 U.S. at 140, 75 S.Ct. 127. Circumstantial evidence is not viewed in isolation. “ While no single piece of evidence may be, sufficient, the “combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.” ’ ” Derr v. Commonwealth, 242 Va. 413, 425, 410 S.E.2d 662, 669 (1991) (quoting Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 564 (1919))).
Whether the defendant’s explanation is a “‘reasonable hypothesis of innocence’ is a question of fact.” Cantrell, 7 Va.App. at 290, 373 S.E.2d at 339. A jury does not have to accept a fact if they find the basis for it is improbable. It can be improbable because it is based on testimony the jury does not believe; or it is not reasonable to draw an inference based on their collective experience of people and events. “[I]t is within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are *361 reasonably related to those facts.” Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976).
Much of the evidence in this case was undisputed. The two sides offered opposing interpretations. A jury resolves such conflict. Indeed, twice juries accepted the interpretation of evidence argued by the Commonwealth.[1] “When, as here, conflicting inferences flow from the undisputed evidence, principles of appellate procedure require us to adopt those conclusions most favorable to the Commonwealth if fairly deducible from the proven facts.” Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982).
When the facts are viewed in the light most favorable to the Commonwealth and all reasonable inferences consistent with guilt are granted to it, no reasonable theories of innocence remain. The combined force of the many concurrent and related circumstances proved beyond a reasonable doubt that the ironing-board-bullet passed through the defendant. Thus, the victim could not have shot her, and he did not Mil himself. As this jury reasonably viewed the evidence, only the defendant could have Mlled him. Accordingly, we affirm.

Affirmed.

. This Court did not grant an appeal on the issue of the sufficiency of the evidence on the first appeal.