COURT OF APPEALS OF VIRGINIA


Present: Judges Humphreys, Agee[*] and Kelsey
Argued at Salem, Virginia


MATTHEW RAYMOND SHROPSHIRE
                                          OPINION BY
v.     Record No. 0382-02-3          JUDGE G. STEVEN AGEE
                                          MARCH 11, 2003
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                    J. Leyburn Mosby, Jr., Judge

          B. Leigh Drewry, Jr. (Cunningham & Drewry, on
          briefs), for appellant.

          John H. McLees, Senior Assistant Attorney
          General (Jerry W. Kilgore, Attorney General,
          on brief), for appellee.


     Matthew Shropshire ("Shropshire") was convicted in a bench

trial in the Circuit Court of the City of Lynchburg on one count

of grand larceny by false pretenses.  On appeal Shropshire

alleges that the evidence was insufficient to establish all the

elements necessary to prove grand larceny by false pretenses.

For the following reasons, we reverse the conviction.[1]

_____

     [*] Justice Agee participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

     [1] Shropshire alleged two other errors by the trial court:
(1) that a continuance granted the Commonwealth violated his due
process rights and (2) the use of an affidavit under Code
§ 8.01-390(B) violated his rights under the Confrontation
Clause.  As we reverse the decision on other grounds, we do not
address Shropshire's other claims.

I.   BACKGROUND

On May 16, 2001, Shropshire looked at a Ford Taurus in the inventory of Oakridge Toyota and told salesman Michael Stanley that he would buy the car "with a check he was going to get from his credit union."  The record does not reflect the parties reached an agreement as to the purchase price of the car. Marshall Wilson, the finance manager, then assisted Shropshire in filling out "a Buyer's Order, Odometer Statement, the standard documents."  None of these documents are in the record, nor is there any description of their terms or if these documents were executed by Shropshire.  Wilson testified he "filled out" the documents "in expectation that he [Shropshire] would come back and purchase it."  Stanley testified that because Shropshire had previously purchased a car from him, he gave Shropshire possession of the Taurus on May 16, 2001, based on his representation that he would return with a credit union check because he had "signed all the paperwork" and "purchased the vehicle."  No "paperwork" is in the record, nor is there a description of its terms.

On May 23, 2001, the manager of Oakridge Toyota received a check from Shropshire which he left in Marshall Wilson's desk drawer.  Nothing appears on the face of the check to denote its purpose.  The check was payable to Oakridge Toyota in the amount of $4,200 and was drawn on an account at Carolina Federal Credit Union, Myrtle Beach, South Carolina.  Oakridge Toyota was later

notified that the check could not be cashed and was "returned unpaid insufficient funds." The record indicates "at some point the car was returned," but does not specify when or by whom.

Shropshire was charged in an indictment with grand larceny by false pretenses from Oakridge Toyota in violation of Code § 18.2-178. At trial, the $4,200 check was introduced into evidence. The Commonwealth then sought to prove Carolina Federal Credit Union did not exist and the check was therefore fraudulent. To do so the Commonwealth offered an affidavit from Joe Ostrowidzki, the Acting Director of Insurance of Region III of the National Credit Union Administration ("NCUA"). Over Shropshire's objection, the trial court admitted the affidavit into evidence.

Mr. Ostrowidzki certified in the affidavit that he is the custodian of all NCUA records for federally chartered and/or insured credit unions in the state of South Carolina. He also certified that a review of those records showed that Carolina Federal Credit Union was neither federally insured nor chartered at any time in 2001.

The trial court convicted Shropshire of obtaining the Taurus by false pretenses from Oakridge Toyota in violation of Code § 18.2-178. Shropshire now appeals to this Court.

## II.  STANDARD OF REVIEW

When considering the sufficiency of the evidence on appeal in a criminal case, this Court views the evidence in the light most favorable to the Commonwealth (as the prevailing party in the trial court), granting to it all reasonable inferences fairly deducible therefrom.  See Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  On review, this Court does not substitute its own judgment for that of the trier of fact.  See Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992).  The trial court's judgment will not be set aside unless it appears that the judgment is plainly wrong or without supporting evidence.  See Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

## III.  ANALYSIS

Shropshire asserts that the evidence was insufficient to establish all the requisite elements of the offense of grand larceny by false pretenses.  We agree.

In order to sustain a conviction for larceny by false pretenses the Commonwealth must prove the following elements:

> "(1) an intent to defraud; (2) an actual fraud; (3) use of false pretenses for the purpose of perpetrating the fraud; and (4) accomplishment of the fraud by means of the false pretenses used for the purpose, that is, the false pretenses to some degree must have induced the owner to part with his property."

*Riegert v. Commonwealth*, 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977) (citation omitted). In addition to the elements above, "'[a]n essential element of larceny by false pretenses is that both title to and possession of property must pass from the victim to the defendant (or his nominee).'" *Baker v. Commonwealth*, 225 Va. 192, 194, 300 S.E.2d 788, 788 (1983) (quoting *Cunningham v. Commonwealth*, 219 Va. 399, 402, 247 S.E.2d 683, 685 (1978)). "The gravamen of the offense . . . is the obtainment of ownership of property, by false representations or pretenses." *Quidley v. Commonwealth*, 221 Va. 963, 966, 275 S.E.2d 622, 625 (1981). Assuming, *arguendo*, that the Commonwealth's evidence proved all other elements of the crime, the record does not contain evidence that Shropshire acquired any type of ownership interest in the Taurus.

In *Lewis v. Commonwealth*, 28 Va. App. 164, 503 S.E.2d 222 (1998), this Court held that the defendant acquired a sufficient property interest to support his conviction for larceny by false pretenses by receipt of a temporary certificate of ownership. The Commonwealth argues that the issuance of a temporary certificate of ownership was not necessary to support the holding in *Lewis* and was not required in this case to prove the requisite element of ownership.[2]

---

[2] For purposes of the element of proof for larceny by false pretenses, we read the terms "title" and "ownership" to be synonomous.

- 5 -

We agree that ownership or title sufficient to support a conviction under Code § 18.2-178 regarding a motor vehicle, could be proven by evidence other than a temporary certificate of ownership or other state issued muniment of title as under Code § 46.2-628.  However, the record in this case does not contain such evidence.

We discussed in Lewis that certain documentation of a sale could effectively vest sufficient indicia of ownership to a motor vehicle in an alleged thief so as to satisfy the requirement for obtaining title (as opposed to mere possession) as an element of the crime of obtaining the vehicle by false pretenses.  Depending on the facts of a case, title might be sufficiently proven by a conditional sale contract, promissory note and security agreement or similar evidence.  Lewis, 28 Va. App. at 168-69, 503 S.E.2d at 223-24.

In the case at bar there is no temporary certificate of ownership or any other state issued title document in the record.  Neither is there a promissory note, sales contract, or other document that would evidence some type of ownership transfer, either equitable or legal, from Oakridge Toyota to Shropshire.  The record reflects only that "paperwork" was prepared.  To deduce a transfer of ownership based on unknown "paperwork" is utter speculation and conjecture.[3]

_____

[3] The dissent represents that Shropshire and Oakridge Toyota entered into a binding oral conditional sales contract which

The record lacks evidence that Shropshire had anything other than mere possession of the vehicle.  Our precedent is clear that a conviction for larceny by false pretenses requires proof beyond a reasonable doubt that title to the property purloined passes to the perpetrator.  See Baker, 225 Va. at 194, 300 S.E.2d at 789; Cunningham, 219 Va. at 402, 247 S.E.2d at 685.  That proof is not contained in the record before us. Without such evidence, the Commonwealth has failed to establish a transfer of title took place to vest Shropshire with ownership rights sufficient to support the conviction.  Based on the

---

transferred a sufficient, but undefined, ownership interest to Shropshire so as to meet the criminal ownership element for obtaining property by false pretenses.  This claim was not argued at trial and the trial court made no such finding. Assuming, but not deciding, that ownership for purposes of the title element of obtaining a motor vehicle by false pretenses can be proven solely by an oral conditional sales contract, the record in this case does not contain evidence establishing such a contract.

While Shropshire and Stanley discussed Shropshire purchasing the Taurus, the record does not show the parties reached an agreement as to the purchase price of the Taurus, much less, what that price was to be.  The record does not reflect the time within which a contract was to be performed, if at all.

While Shropshire apparently indicated he was going to get a credit union check, the record is silent as to whether such a check was to represent a refundable deposit, a down payment, full payment, or something else.  Further, nothing in the record represents Oakridge Toyota was retaining a security interest in the car or that it had parted with anything other than mere possession when Shropshire drove the Taurus off the Oakridge Toyota lot.

In short, the covenants sufficient to create a binding contract just don't appear in the record.  Inference from surmise on appeal cannot supply the evidence the Commonwealth failed to present at trial.

- 7 -

record in this case, the trial judge's determination that title or ownership of the Taurus passed to Shropshire was plainly wrong and without evidence to support it.  For this reason we reverse Shropshire's conviction and dismiss the case.

<u>Reversed and dismissed.</u>

Kelsey, J., dissenting.

In cases where "goods are sold under a conditional sales contract and the legal title is merely retained for purposes of security, the vendee gets a sufficient property interest to support a conviction of obtaining money by false pretenses provided the other requisites of the offense are present." Lewis v. Commonwealth, 28 Va. App. 164, 168, 503 S.E.2d 222, 224 (1998) (citations omitted).

The majority accepts this principle of law, but finds the facts insufficient to establish that Shropshire entered into a conditional sale contract with the seller. This holding rests on the assertion that the "record lacks evidence that Shropshire had anything other than mere possession of the vehicle." The majority comes to this conclusion, I believe, by (i) restating the facts in the light most favorable to Shropshire, (ii) assuming that a conditional sale contract requires some measure of formality not present in this case, and (iii) applying a less-than-deferential standard of appellate review. For these three reasons, I respectfully dissent.

I.

Viewed in the light most favorable to the Commonwealth, the evidence — coupled with inferences reasonably deduced from it — proved that on May 16, 2001, Shropshire and Oakridge Toyota entered into a sale contract that identified:

- 9 -

- the object of the sale agreement (a Ford Taurus);

- the purchase price ($4,200);

- the date of delivery (May 16, 2001);

- the timing of payment (as soon as he could "get a check from his credit union to pay for it"); and

- the seller's retention of the document of title as security for the buyer's payment.

Oakridge Toyota agreed to deliver the vehicle to Shropshire on May 16, 2001, based on his promise that he would bring back "a check from his credit union."  Relying on this representation, the salesman testified that he "filled the paperwork out and took it to our finance manager."  The finance manager, comfortable that Shropshire "was going to bring [him] a check," allowed Shropshire to take the Ford Taurus that day.  At that point, Oakridge Toyota had fully performed its part of the contract.  Under this arrangement, if Shropshire's check (which arrived "the next day or the day after" the sale) had been valid, he would have received the document of title.

This evidence proved that the contract was fully formed on May 16, 2001 — the day Shropshire picked out the vehicle he wanted to buy, negotiated the price, agreed on the payment terms, signed all the relevant paperwork, and drove the car away.  If this transaction was not a sale, it is hard to imagine what it might be.  As the Oakridge Toyota salesman testified:

Q:     Did you have occasion to assist one
       Matthew Shropshire for the <u>purchase</u> of
       a car at Oakridge Toyota?

A:     <u>Yes, I did</u>.

       *       *       *       *       *       *       *

Q:     And, Mr. Stanley, how was it that you
       came in contact with Mr. Shropshire in
       May of this year?

A:     He had previously <u>purchased</u> a car from
       me before that with cash money; and he
       came in and wanted to <u>purchase</u> another
       one.  And I helped him.

       *       *       *       *       *       *       *

Q:     Okay.  Now, at the time he indicated to
       you that he wanted to <u>buy</u> this Ford
       Taurus?

A:     <u>That's correct</u>.

       *       *       *       *       *       *       *

Q:     Did you help fill out any of the
       paperwork, Mr. Stanley?

A:     I filled the paperwork out and took it
       to our finance manager, Mr. Wilson.

Q:     <u>And at that time had he, in fact,
       purchased the vehicle</u>?

A:     <u>Yes, he had</u>.

Q:     And . . . Did you all give him the
       vehicle in anticipation of him
       producing the check?

A:     Yes, I did.

Q:     And did you do that because he had
       purchased a car from you before?

A:     Yes.  <u>He did the same thing, brought me
       cash back the next day, the first time</u>.

- 11 -

                    *    *    *    *    *    *    *

     Q:    And so did he, in fact, drive off the
           lot that day with the Ford Taurus?

     A:    Yes, sir.

     Q:    And this is before he presented the
           check?

     A:    Yes, sir.

                    *    *    *    *    *    *    *

     Q:    Mr. Stanley, the reason that you – or
           what was the reason that you allowed
           the Defendant to drive off the lot
           without paying for the car?

     A:    Because I trusted him.  And he had
           signed all the paperwork and done the
           contracts.

     Q:    So when he said, I'm going to go get
           the check from my credit union, you
           took him at his word?

     A:    Of course I did.

The finance manager at Oakridge Toyota likewise confirmed

that Shropshire purchased the vehicle on May 16, 2001, despite

the fact that he would not receive the document of title until

full payment was made:

     Q:    As finance manager, do you also sell
           cars?

     A:    Yeah.

                    *    *    *    *    *    *    *

     Q:    How was it you first came into contact
           with Mr. Shropshire?

     A:    He came in and bought a car prior to
           that.

- 12 -

Q:  He purchased a car previously?

A:  (Witness nodded his head.)

Q:  And he indicated he was interested in
    another car?

A:  Uh-huh.

    *    *    *    *    *    *    *

Q:  Did he express interest in the Ford
    Taurus?

A:  Yeah.

    *    *    *    *    *    *    *

Q:  All right.  What paperwork did you
    assist him in?

A:  A Buyer's Order, Odometer Statement,
    the standard documents.

    *    *    *    *    *    *    *

Q:  So how did [Shropshire] first approach
    you then?

A:  He came - the salesman brought the
    paperwork in and said, this gentleman
    is buying an automobile; here's the
    paperwork, go to the computer and print
    the paperwork.

    *    *    *    *    *    *    *

Q:  And then after that, that's when you
    did - filled out all the paperwork?

A:  Correct.

A few days later, Shropshire delivered a $4,200 check to

Oakridge Toyota.  A co-manager on duty that day, who had not

participated in the sale, accepted the check from Shropshire

"for payment on a vehicle."

- 13 -

At no point at trial or on appeal has Shropshire argued that he entered into some agreement other than a purchase contract. Nor has he ever contended that the promised check referred to something other than payment of the purchase price. In his brief on appeal, Shropshire summarizes the transaction this way:

> Matthew Shropshire initially said he wanted to trade a 1988 Blazer for the Taurus but later decided to purchase it without a trade-in. He went on to say he would have to get a check from his credit union. Mr. Stanley [the salesman] completed the necessary paperwork and turned it over to Marshall Wilson, the finance manager. He also gave Matthew Shropshire possession of the vehicle prior to delivery of payment and without seeing a check. Marshall Wilson completed the paper work for Matthew Shropshire's purchase of the Taurus on May 16, 2001. Mr. Wilson did not receive a deposit for the car and understood a check would be delivered as payment.

Appellant's Brief at 6-7 (citations to transcript omitted and emphasis added).

## II.

In a conditional sales contract, the purchaser secures "the right to acquire" the property "by completing the payments pursuant to the terms of the contract." Chappell v. State, 25 N.E.2d 999, 1001 (Ind. 1940). The vendor in such a transaction retains title to the goods. This "retention of title," however, is not absolute ownership; it is "at most, a form of security for the payment of the purchase money." Lewis, 28 Va. App. at

- 14 -

169, 503 S.E.2d at 224 (citation omitted).  As the United States

Supreme Court has explained:

> The parties to a conditional sale have
> divided property interests in the goods.
> The buyer is the beneficial and substantial
> owner, with such attributes of ownership as
> possession, use and control, and has his
> equity of redemption sedulously guarded by
> the law.  The seller, on the other hand,
> reserves title to the goods solely as
> security for payment or performance by the
> buyer.  Essentially a conditional sale is
> only a credit device.

Int'l Harvester Credit Corp. v. Goodrich, 350 U.S. 537, 545 n.11

(1956) (emphasis added and citation omitted).  Purchasers

thereby become "owners of the property" subject only to the

security interest rights of their sellers.  Lewis, 28 Va. App.

at 169, 503 S.E.2d at 224 (citation omitted).

Virginia common law has an unbroken history of recognizing

this form of secured transaction.  See, e.g., C.I.T. Corp. v.

Guy, 170 Va. 16, 21, 195 S.E. 659, 660 (1938) ("Conditional

sales of automobiles is a practice widely adopted and are often

financed by corporations organized for that purpose."); Jones v.

Morris Plan Bank, 168 Va. 284, 290, 191 S.E. 608, 609 (1937)

("The sole purpose of the conditional sales contract was to

retain the title in the seller until the note was paid."); Royal

Indem. Co. v. Hook, 155 Va. 956, 960, 157 S.E. 414, 415 (1931)

("This purchase was made under a conditional sales contract

whereby title remained in the vendor to secure to it the balance

due."); <u>Transit Corp. v. Four Wheel Drive Auto Co.</u>, 151 Va. 865, 873, 145 S.E. 331, 333 (1928) (the "purpose" of a conditional sales contract is "to secure the unpaid purchase money as contemplated by the original contract of purchase").[4]

Virginia statutory law likewise treats conditional vendees as beneficial owners.  Under the Virginia Motor Vehicle Act, Code § 46.2-100, an "owner" includes not only a person holding "legal title" but also one acquiring the vehicle pursuant to a "conditional sale . . . with an immediate right of possession vested in the conditional vendee" pursuant to the contract.  <u>See also</u> Code § 46.2-1500 ("Retail installment sale" includes sales "in which the price of the vehicle is payable in one or more installments and in which the seller has . . . retained title to the goods" under a "conditional sale" contract.).

While not immediately passing absolute legal title, a conditional sales contract passes equitable title —— thereby setting in motion the process by which the purchaser will eventually, by satisfying the contractual obligations, obtain absolute legal title.  <u>See</u> <u>Lewis</u>, 28 Va. App. at 169, 503 S.E.2d at 224.  In the meantime, though, the purchaser's beneficial ownership interest remains sufficient "to support a conviction

---

[4] The Uniform Commercial Code codified this principle by retooling the reservation of title into mere retention of a security interest.  <u>See</u> Code § 8.2-401(1) ("Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.").

of obtaining money by false pretenses . . . ." Lewis, 28 Va. App. at 168, 503 S.E.2d at 224 (quoting Whitmore v. State, 298 N.W. 194, 195 (Wis. 1941)); see Franklin v. State, 214 So. 2d 924, 925 (Ala. 1968); People v. Aiken, 34 Cal. Rptr. 828, 831 (Cal. Dist. Ct. App. 1963).

For purposes of false pretenses, to require that both legal and equitable title pass would create a legal impossibility. See Lewis, 28 Va. App. at 168, 503 S.E.2d at 224. The transfer-of-title requirement "cannot mean an absolute title because any title obtained by fraud is voidable and the requirement would make it impossible for the crime to be consummated." Id. (quoting Whitmore, 298 N.W. at 195). If a contrary rule prevailed, an "industrious and designing thief who, having perpetrated the proper fraud by making false representations, could escape criminal liability as long as the official title remained with the owner as security." Lewis, 28 Va. App. at 169, 503 S.E.2d at 224 (citation omitted).

### III.

Given these legal principles, the question whether sufficient facts exist to support the trial court's judgment depends on what standard of review we apply.

When faced with a challenge to the sufficiency of the evidence, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is

- 17 -

"plainly wrong or without evidence to support it." Davis v.

Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)

(citations omitted); see also McGee v. Commonwealth, 25 Va. App.

193, 197-98, 487 S.E.2d 259, 261 (1997) (en banc). When a jury

decides the case, Code § 8.01-680 requires that

> we review the jury's decision to see if
> reasonable jurors could have made the
> choices that the jury did make. We let the
> decision stand unless we conclude no
> rational juror could have reached that
> decision.

Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278

(2002) (en banc). The same standard applies when a trial judge

sits as the fact finder because "the court's judgment is

accorded the same weight as a jury verdict." Shackleford v.

Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001).[5]

In other words, when faced with a challenge to the

sufficiency of the evidence, a reviewing court does not "ask

itself whether it believes that the evidence at the trial

established guilt beyond a reasonable doubt." Jackson v.

---

[5] Unless the fact finder acted unreasonably, we consider it our duty not to "substitute our judgment for that of the trier of fact, even were our opinion to differ." Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002) (quoting Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)); see also Pease, 39 Va. App. at 355, 573 S.E.2d at 278; Harris v. Commonwealth, 38 Va. App. 680, 691, 568 S.E.2d 385, 390 (2002). Thus, on appeal from a bench trial, if "reasonable jurists could disagree about the probative force of the facts, we have no authority to substitute our views for those of the trial judge." Campbell v. Commonwealth, 39 Va. App. 180, 186, 571 S.E.2d 906, 909 (2002).

_Virginia_, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted).  Instead, the relevant question is whether "_any_ rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  _Id._ at 319 (emphasis in original).  This deference applies not only to the historical facts themselves, but the inferences from those facts as well.  "The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact."  _Hancock v. Commonwealth_, 12 Va. App. 774, 783, 407 S.E.2d 301, 306 (1991).

Governed by this standard of review, the evidence satisfies the sufficiency test.  A rational fact finder could have found (and, in this case, did find) that Shropshire and Oakridge Toyota entered into a sales contract on May 16, 2001.  The rationality of this conclusion rests on the uncontradicted testimony of the Oakridge Toyota salesman:

> Q:  Did you help fill out any of the paperwork, Mr. Stanley?
>
> A:  I filled the paperwork out and took it to our finance manager, Mr. Wilson.
>
> Q:  And at that time had he, in fact, purchased the vehicle?
>
> A:  Yes, he had.

Because Shropshire was "buying an automobile," the finance manager required him to fill out the necessary "paperwork" which included a "Buyer's Order, Odometer Statement, the standard

- 19 -

documents."  As the salesman put it, Shropshire had "signed all the paperwork and done the contracts."

Under Virginia law, a "buyer's order" is a statutory term of art with a discrete meaning.  A buyer's order must be issued by a dealer "for each sale or exchange of a motor vehicle." Code § 46.2-1530.  A buyer's order must include, among other things, the "date of the sale or trade," the "sale price of the vehicle," and other terms of the sale.  Id.  The issuance of a buyer's order in this case confirms that Shropshire entered into a purchase agreement with Oakridge Toyota at the time he took possession of the vehicle.  Aside from that fact — the character of the transaction as a purchase agreement — it matters not, for purposes of showing a transfer of ownership interest under false pretenses law, what other specific contractual covenants accompanied the transaction.

The trial judge did not, as the majority asserts, "deduce a transfer of ownership based on unknown 'paperwork'" and thereby engage in "utter speculation and conjecture." Ante at 6.  The trial judge's deduction follows from the fact that Shropshire (i) "purchased" the Taurus "at that time," (ii) "signed all the paperwork and [had] done the contracts," and after doing so (iii) took immediate possession of the vehicle and drove it off the lot.

The conditional sale aspect of the contract, sufficient to transfer an ownership interest under Lewis, also rested on

undisputed evidence.  The "reason" Shropshire was allowed "to drive off the lot" was because, as the salesman explained, "I trusted him."  Shropshire obtained immediate possession because he agreed to bring back "a check from his credit union."  At that point, Oakridge Toyota had fully performed its part of the contract.  And the essential elements of that contract place it squarely within the definition of a conditional sale.  Under this arrangement, if Shropshire's check (which arrived "the next day or the day after" the sale) had been valid, he would have had an indisputable right to the document of title.[6]

Finally, I disagree that the conditional sales contract point "was not argued at trial and the trial court made no such finding."  Ante at 6-7, n.3.  Both the trial judge and Shropshire's counsel commented on Lewis during the closing argument colloquy.  Shropshire's counsel claimed Lewis required the physical transfer of a temporary document of title before a vendee could obtain any ownership interest — completely

---

[6] Shropshire does not argue that the credit union check was intended to be for any purpose other than to purchase the Taurus.  He argues only that the purchase price check arrived after the delivery of the vehicle.  See Appellant's Brief at 14 ("Mr. Stanley, however, did not rely upon the check or the delivery of any funds to part with possession of the car.  He knew Matthew Shropshire did not have the funds necessary to purchase the car when he allowed it to leave the dealership (App. 117-19).  No crime is committed when a salesman, anxious to complete a sale, does not take some consideration in return for his car.").  What Shropshire misses is that the promise to pay the purchase constitutes "consideration" recognized by contract law.

- 21 -

overlooking the concept of equitable title endorsed by Lewis and accepted by the majority, see ante at 6.[7]  In reply, the Commonwealth correctly observed:  "With respect to his argument about how the car was transferred, I think [Shropshire's counsel is] getting extremely technical on a distinction without a difference."[8]  The trial court agreed, holding that "the dealership parted with possession and Title even though Legal Title [had] not actually transferred at that point."

As to the contention that the "trial court made no such finding," ante at 6-7, n.3, the court's conviction order is all the "finding" we need.  Under settled principles, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact

_____

[7] On appeal, Shropshire continues to rely on this argument. See Appellant's Reply Brief at 5 (The Commonwealth's "reliance on Lewis v. Commonwealth, supra is misplaced.  In Lewis, a temporary certificate of title was given to Mr. Lewis.  Lewis v. Commonwealth, supra, 28 Va. App. at 169.  Such is not the case before the Court . . . .").

[8] The distinction drawn between an oral versus a written conditional sale contract is one raised only by the majority. See Ante at 6, n.3.  At no point in this case (either during trial, in the appellate briefs, or at oral argument) has anyone argued that false pretenses law includes some de facto statute of frauds requirement.  Nothing in Lewis imposes such a rule, and it cannot be extrapolated from any of the precedent cited by the parties or the court.  At trial, the Commonwealth offered extensive evidence of a conditional sale and, on appeal, argues that the evidence of the sale was sufficient to support the conviction.  No waiver can be found under these circumstances.

resolved any such conflicts in favor of the prosecution, and must defer to that resolution[.]'" Wright v. West, 505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326)).

IV.

Upon entering into a conditional sales contract and receiving unrestricted possession, Shropshire obtained equitable title of the vehicle and became its beneficial owner for purposes of false pretenses law. See Lewis, 28 Va. App. at 169, 503 S.E.2d at 224. Given the evidence before the trial court, the majority errs in finding no "rational trier of fact" could have come to this conclusion. Jackson, 443 U.S. at 319.

I respectfully dissent.