COURT OF APPEALS OF VIRGINIA

Present:  Judges Frank, Kelsey and Senior Judge Willis
Argued at Chesapeake, Virginia


GEORGE BERTRUM BUSKEY

                                        MEMORANDUM OPINION* BY
v.    Record No. 0919-02-1               JUDGE D. ARTHUR KELSEY
                                             APRIL 15, 2003
COMMONWEALTH OF VIRGINIA


         FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
                     AND COUNTY OF JAMES CITY
               Samuel Taylor Powell, III, Judge

         James R. Benkahla for appellant.

         Amy Hay Schwab, Assistant Attorney General
         (Jerry W. Kilgore, Attorney General, on
         brief), for appellee.


    George Bertrum Buskey challenges his conviction for cruelty

to animals in violation of Code § 3.1-796.122.  Buskey claims the

Commonwealth failed to present sufficient evidence to demonstrate

his guilt beyond a reasonable doubt.  Finding the evidence

sufficient to sustain the conviction, we uphold the decision of

the trial court.

                              I.

    On appeal, we review the evidence "in the light most

favorable to the Commonwealth" and "accord the Commonwealth the

benefit of all inferences fairly deducible from the evidence."

    * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

Morrisette v. Commonwealth, 264 Va. 386, 389, 569 S.E.2d 47, 50 (2002); see also Holsapple v. Commonwealth, 39 Va. App. 522, 528, 574 S.E.2d 756, 758-59 (2003) (en banc). That principle requires us to "discard the evidence of the accused" which conflicts, either directly or inferentially, with the Commonwealth's evidence. Holsapple, 39 Va. App. at 528, 574 S.E.2d at 758-59 (citation omitted); see also Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).

After returning home from school on October 24, 2001, ten-year-old Megan Riley observed Brutus, a neighbor's dog, in the road outside her home. Megan, who had played with Brutus in the past, went outside to see the dog. When she approached Brutus, Megan noticed that the dog was so skinny that its "ribs and its spine" were visible. Alerted by Megan's calls, her father, Officer Greg Riley, met Megan at the front door of their home. Riley noticed that the dog was so "thin, emaciated" that Riley "could see its ribs and its tail bones, its legs or hindquarters through its skin." Riley brought the dog inside his home, "gave it some food and water," then called animal control.

Officer LaBell, an animal control officer with James City County, arrived at the Rileys' home shortly afterward. LaBell immediately recognized Brutus, who was "pretty much a resident at the pound." LaBell recalled that, the last time she saw Brutus in July 2001, Brutus "was a pretty happy-go-lucky dog,

-

[if you would] go in the kennel, he would jump on you, want to play, and he never had a problem with eating his food or he never had a problem with anybody."  Now, three months later, Brutus was completely different.  His weight had plummeted from sixty-five pounds to under fifty-three pounds — a loss of nearly twenty percent of his body weight.  "[H]e was lethargic, he just laid on the floor, didn't get up."  Brutus was so weak that LaBell and another person had to lift him into the truck to take him to the pound and the veterinarian.

Like LaBell, Dr. Welch, a veterinarian with The Animal Clinic of Williamsburg, recalled seeing Brutus in both July and October 2001.  In July, Welch noticed Brutus was "severely emaciated," "had very little, if any . . . skeletal or muscle mass present."  Brutus also "had some upper respiratory infection" and "some minor skin abrasions."  Fecal analysis taken from a stool sample indicated that Brutus had "severe intestinal parasites" in the form of hookworms and whipworms.[1]  Welch "dewormed" Brutus and informed Shirley Anderson, an animal

---

[1] Welch noted "the worms have a life cycle where . . . you have to repeat treatments at specific intervals depending on [the] kind of worm with specific medication in order to eventually eradicate [the worm]."  Welch mentioned, in addition, "it's also important to decontaminate the environment" by removing the dog's stool from his living area.

control officer, that Brutus would need follow-up care.[2]  Despite the dog's physical problems, Welch noted that Brutus's "attitude was pretty bright."

Welch observed a severe deterioration in Brutus's physical condition and countenance between July and October.  Though Brutus still appeared "emaciated" and was anemic, he now acted "rather depressed."  He was not interested in food and was dehydrated.  Blood tests revealed that Brutus continued to have hookworms and whipworms and that he had acquired giardi, an additional parasite.  Brutus was "in a metabolic state where he was existing on digesting his own proteins, his own muscle mass."  Welch, in short, testified that when he saw Brutus in late October, Brutus was "at the end stage of starvation."  To reach this point of starvation would take, in Welch's opinion, "certainly an extended period of time, weeks, months."

It was possible, Dr. Welch noted, to attribute the dog's anemia and other physical problems to the parasites, which, in her opinion, had been in the dog's body for at least three

---

[2] Anderson visited Buskey's home to relay the content of her conversation with Dr. Welch.  At trial, Anderson recalled the conversation with Buskey, where she informed Buskey of Welch's observation that Brutus had "intestinal parasites" that necessitated follow-up treatments to the deworming.  On several occasions following this conversation, Anderson "went by [Buskey's] residence" and "left notes" to ascertain how the dog was doing.  Anderson even "spoke to an elderly gentleman there and inquired how the dog was doing."  Despite Anderson's efforts, Buskey never responded.

weeks.[3]  Even with the dog's "parasite burden," Welch did not believe it was possible for the dog to lose the weight it did in just a few weeks even if "he was gone for ten days and had nothing to eat."

Kenneth Jones, a "competitive business associate" of Buskey's, claimed that, beginning October 5, 2001, he had been watching Brutus while Buskey was out of town.  Approximately eight days before Buskey returned, Jones testified, "the dog ran away."  The dog then reappeared in an emaciated state one week later.  Jones did not report the dog's disappearance to animal control, nor, upon learning that Buskey was charged with animal cruelty, did Jones inform animal control what had happened.

Following the presentation of the Commonwealth's evidence at trial, Buskey moved to strike the evidence, claiming that the Commonwealth failed to prove that Buskey violated the animal cruelty statute.  The trial court overruled the motion and found Buskey guilty of animal cruelty for failing "to provide the emergency veterinary treatment necessary for this particular case."  The court sentenced Buskey to ninety days in jail, with thirty days suspended.

---

[3] This opinion was based on the fact that Brutus was excreting worm eggs.  As Welch noted, "if they are excreting eggs, then you have mature worms . . . and that usually takes three weeks."

I.

When faced with a challenge to the sufficiency of the evidence, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it."  Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002) (citations omitted); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (en banc).  When a jury decides the case, Code § 8.01-680 requires that "we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make."  Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (en banc).  "We let the decision stand unless we conclude no rational juror could have reached that decision."  Id.  The same standard applies when a trial judge sits as the fact finder because "the court's judgment is accorded the same weight as a jury verdict."  Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001).[4]

In other words, when faced with a challenge to the sufficiency of the evidence, a reviewing court does not "ask itself whether it believes that the evidence at the trial

_____

[4] Unless the fact finder acted unreasonably, we consider it our duty not to "substitute our judgment for that of the trier of fact, even were our opinion to differ."  Wactor, 38 Va. App. at 380, 564 S.E.2d at 162 (quoting Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)); see also Pease, 39 Va. App. at 355, 573 S.E.2d at 278; Harris v. Commonwealth, 38 Va. App. 680, 691, 568 S.E.2d 385, 390 (2002).

-

established guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted).  Instead, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original).  This deference applies not only to the historical facts themselves, but the inferences from those facts as well.  "The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact."  Hancock v. Commonwealth, 12 Va. App. 774, 783, 407 S.E.2d 301, 306 (1991).

Governed by this standard of review, the evidence satisfies the sufficiency test.  A rational fact finder could have found that Buskey violated Code § 3.1-796.122(A)(ii), which prohibits a person from depriving "any animal of necessary food, drink, shelter, or emergency medical treatment."  At trial, Dr. Welch testified that, once the eggs of parasitic worms were introduced into an animal's body, the "eggs mature into worms that habitate the intestines, produce more eggs, continue the cycle."  Once the dog has excreted worm eggs through its stool, Welch testified, adult worms are, at that time, present in the dog's intestines and producing offspring.  It would usually take "three weeks" for this to occur, but the time period for one of the worm types found in the dog "would be three months."

-

Based on Dr. Welch's testimony, the trial judge noted that the presence of worm eggs in Brutus's stool in late October indicated that Brutus had adult worms in his system for "three months to three weeks." Due to the prolonged period in which the worms infested the dog's body, the trial judge concluded: "I can't say that Mr. Buskey failed to provide food and drink or shelter during this time period, but what I can say is that he failed to provide the emergency veterinary treatment necessary for this particular case."

So serious was the dog's parasite problem that the trial judge rejected Buskey's claim that Brutus's condition had deteriorated merely in the time the dog had been missing. Welch opined that Brutus's precipitous weight drop would be very unlikely in the short time the dog had allegedly run away, even if the dog ate nothing during that time. Accepting this opinion, the trial court reasoned that, even assuming the dog indeed ran away,

> [t]he time period that the dog was gone was insufficient for the new worms to grow. They might be eggs. He might have picked up the eggs by drinking the water or whatever, but they wouldn't have grown into the size and shape that they had according to the testimony of Dr. Welch by the time the dog was found October 24.

Based on medical evidence, the trial court reasonably inferred that Brutus's condition was so advanced that, in the three week period during which he was missing, the worm eggs could not have entered his system, matured into adult worms, and caused

-

a near twenty-percent weight loss.  The dog's condition, instead, stemmed from Buskey's failure to provide emergency care following Brutus's July 2001 visit with Dr. Welch.

III.

The evidence supports the trial court's conclusion that Buskey committed cruelty to animals by failing to provide emergency veterinary treatment necessary for his dog.  As a result, we affirm Buskey's conviction for violating Code § 3.1-796.122(A)(ii).

<u>Affirmed</u>.