COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Elder,
         Annunziata, Bumgardner, Frank, Humphreys, Clements,
         Agee,* Felton and Kelsey
Argued at Richmond, Virginia


CARLTON WENDELL DUNCAN
                                    MEMORANDUM OPINION** BY
v.   Record No. 1060-01-1          JUDGE JEAN HARRISON CLEMENTS
                                         APRIL 8, 2003
COMMONWEALTH OF VIRGINIA


                  UPON A REHEARING EN BANC

       FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
                  AND COUNTY OF JAMES CITY
                  Thomas B. Hoover, Judge

          LeeAnn N. Barnes for appellant.

          Virginia B. Theisen, Assistant Attorney
          General (Jerry W. Kilgore, Attorney General,
          on brief), for appellee.


     On August 27, 2002, a unanimous panel of this Court reversed

and dismissed the conviction of appellant, Carlton Wendell Duncan,

for felony child abuse and neglect, in violation of Code

§ 18.2-371.1(B).  The panel determined that the Commonwealth's

evidence did not establish beyond a reasonable doubt that Duncan's

willful acts and omissions in the care of his six-month-old son

_____

        * Justice Agee participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

        ** Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

was conduct so gross, wanton and culpable as to show a reckless disregard for the child's life.  We granted the Commonwealth's petition for a rehearing en banc and stayed the mandate of the panel's decision.  Upon rehearing en banc, we reverse the trial court and dismiss the conviction.

When the sufficiency of the evidence is challenged on appeal, we review the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom."  Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1997).  "In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom."  Watkins v. Commonwealth, 26 Va. App. 335, 349, 494 S.E.2d 859, 866 (1998).  We are further mindful that the "credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination."  Crawley v. Commonwealth, 29 Va. App. 372, 375, 512 S.E.2d 169, 170 (1999).  We will not disturb the conviction unless it is plainly wrong or unsupported by the evidence.  Sutphin v. Commonwealth, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

Here, viewed in the light most favorable to the Commonwealth, the evidence established that, on June 12, 2000, around 3:30 p.m., Jennifer Dansby returned home from work to find Michelle Cribbs,

-

several friends, and Duncan's six-month-old son there.  Duncan was not there.  Dansby shared the home with Cribbs and Elizabeth Nemo.  She had first met Duncan and his baby the day before when Dansby's ex-housemate had invited Duncan to Dansby's house.  The baby was awake when Dansby got home but would doze off as Dansby and the others took turns holding him and playing with him.  There was no baby food or formula in the house, so Dansby and her friends were unable to feed the child.  According to Dansby, nobody fed the child from 3:30 p.m. until 11:00 p.m.

Nemo arrived home at 9:30 p.m.  Later in the evening, an impromptu party began as other friends arrived and people started drinking beer and using illegal drugs.  Dansby, her housemates, and her friends continued to take turns holding the baby, passing him around.  Duncan arrived at the house around 10:30 p.m., bringing a bag of marijuana with him.  Nemo noticed that his eyes were "glazed over" and the whites of his eyes were yellow.  Duncan began drinking with the group.  When the subject of babies came up, Duncan started talking about women he had impregnated and the abortions they had had.  Later, Duncan took the baby from Nemo, put him on the couch, and, holding him by his hands, lifted him up off the couch.  The baby started crying.

Around midnight, the baby became fussy and started crying loudly.  Duncan, saying he would "take care of the problem," took the child from his carriage in the living room and carried him into the bathroom, and then into a back bedroom.  Nemo, who was

-

concerned about the baby, followed them.  Looking into the bedroom, she saw the baby lying on a futon.  Duncan was sitting next to the futon, lifting it "as if it was going towards the baby's body."  When Duncan saw Nemo, he put the futon down and told her he was looking for a pacifier.  Duncan left the room, and Nemo picked up the baby, who was still crying.

Duncan went into the kitchen.  Dansby heard him open the refrigerator door, which was "odd," she thought, because there was only beer and wine coolers in the refrigerator.  Approximately five minutes later, Duncan came out of the kitchen with a baby bottle, which he took to the back room and gave to Nemo.  Nemo started feeding the child, and Duncan left the room and then went outside.

While feeding the baby, Nemo went into the living room and sat down with her friends.  Nemo then noticed that the liquid in the baby bottle had a "pinkish color" and smelled like wine cooler.  After a friend tasted the liquid in the bottle and confirmed that it tasted of alcohol, Dansby, who described the liquid as having a "milky pinkish color," called the hospital and the police.  She then took the baby bottle, which was a little more than half full, and hid it in the microwave oven until the police arrived.  While in the kitchen, Dansby noticed that a bottle of wine cooler was missing from the refrigerator.  She found an open bottle of wine cooler that had not been there before on the kitchen counter behind some fast-food bags of trash.  It

-

had approximately three inches of liquid missing from the top. The contents of the bottle were "pink."

Approximately fifteen minutes later, Duncan, who was unaware the police had been called, came back inside to check on his child. He sat on the couch next to Nemo, who continued to hold the baby until the police came.

When the police arrived, Officer Nacastro noticed that Duncan had "bloodshot eyes," his speech was "slightly mumbled," and he smelled "of intoxicant[s]." The police took the baby bottle and the opened bottle of wine cooler for analysis. Laboratory tests revealed that the liquid in the twelve-ounce bottle of wine cooler was 3.2% ethyl alcohol by volume. The liquid in the eight-ounce baby bottle, which the police noted was "whitish [with a] little pinkish color in that," was 2.8% ethyl alcohol by volume.

At trial, Duncan denied putting any alcohol in his son's baby bottle. He said he picked up the baby bottle from the kitchen table and gave it to Nemo, but did not know it contained wine cooler. He also testified that he had fed the baby apple raisin cereal earlier in the evening. He also claimed he put his son on the futon in the back bedroom and rubbed his back so he could go to sleep.

Code § 18.2-371.1(B) provides that "[a]ny parent, guardian, or other person responsible for the care of a child under the age of eighteen whose willful act or omission in the care of such

-

child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony."

After hearing the evidence and argument of counsel, the trial judge stated:

> I find that Mr. Duncan is not a believable witness. I reject his testimony as to the explanation. I find the Commonwealth's witnesses, again Ms. Nemo and Ms. Dansby together with Officer Nacastro, to clearly show and prove beyond a reasonable doubt that the defendant took the baby back to the back bedroom and whatever happened on the [futon], he then is the one who goes to the kitchen area, he comes back with a bottle that has this clear pinkish substance in it, he gives the bottle to Ms. Nemo, then he walks out.
> Feeding alcohol to a six-month baby is clear neglect. Coupled with all the other acts, omissions and commissions that he did, I find the defendant guilty beyond a reasonable doubt of the felony charge.

On appeal, Duncan does not challenge the sufficiency of the evidence to show that he committed certain improper acts and omissions in the care of his son and that such acts and omissions were willful. In addition, he concedes that such willful acts and omissions could be construed as being irresponsible, derelict, and negligent. He argues, however, that, even viewing the evidence in the light most favorable to the Commonwealth, his willful acts and omissions were not so gross, wanton, and culpable as to show a reckless disregard for human life.

The Commonwealth argues that Duncan's acts and omissions in the care of his son support his conviction. Specifically, the

-

Commonwealth asserts that Duncan's leaving the child in the care of people he had known for just a day; failing to feed, or make sure someone else fed, the child for more than seven hours; returning to Dansby's home intoxicated and in possession of marijuana; "put[ting] the child on a futon and then lift[ing] the futon until he was caught" by Nemo; and, most significantly, causing Nemo, unbeknownst to her, to feed wine cooler to the baby was conduct so gross, wanton and culpable as to show a reckless disregard for the life of his six-month-old son. We disagree with the Commonwealth.

Plainly, Duncan was negligent in caring for his child. His conduct was inexcusable and cannot be condoned. A finding of negligence, however, is not enough, by itself, to sustain a conviction for criminal abuse and neglect of a child under Code § 18.2-371.1. See Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 457 (1999) (holding that "something more than negligence must be proved beyond a reasonable doubt to support [defendant's] conviction" of criminal child neglect). To sustain Duncan's conviction in this case, the Commonwealth had to prove beyond a reasonable doubt that Duncan committed a willful act or omission in the care of his son that was "so gross, wanton, and culpable as to show a reckless disregard" for the child's life. Code § 18.2-371.1(B). In Snow v. Commonwealth, 33 Va. App. 766, 775, 537 S.E.2d 6, 11 (2000), we held that the defendant's act of driving a car with children in it in excess of one hundred miles

-

per hour while trying to elude the police was not only illegal but "dangerous," and, thus, constituted conduct "so gross, wanton, and culpable as to show a reckless disregard for human life."  The same cannot be said, however, of the willful acts and omissions before us in this case.

Here, although Duncan, as the Commonwealth notes, left his son with women he had known for only a day, no evidence showed that the women were irresponsible or that Duncan had reason to believe they were unable or unwilling to care for the baby, or that they would place the child's life at risk.  Furthermore, the evidence supports the trial court's finding that the women found "the baby interesting and cute" and enjoyed "looking after" him.  Indeed, they continued to play with and hold the child even after Duncan returned to the women's house.  In addition, Duncan interacted with his son upon his return to the house and, despite his apparent intoxication and possession of illicit drugs, responded to him when the child became fussy and cried loudly.

Furthermore, although Nemo testified that she was concerned for the baby's safety when Duncan took the child to the back bedroom after announcing he would "take care of the problem," we find, on the evidence presented, that her assignment of ill will to Duncan was purely speculative, as was her perception that Duncan intended to harm the child when she saw him lift the futon. The trial court correctly gave little, if any, weight to such conjecture in reaching its decision.

-

Likewise, the evidence did not show that Duncan's failure to feed his son for seven and a half hours constituted conduct so gross, wanton, and culpable as to show a reckless disregard for the child's life, particularly as there was no evidence that the baby was hungry or otherwise in distress during that period of time. In fact, the evidence showed that, when the baby became fussy and started to cry loudly, Duncan took steps to feed him, albeit with a bottle containing a liquid mixture, part of which was wine cooler—which brings us to the crux of this appeal.

In finding Duncan guilty of violating Code § 18.2-371.1(B), the trial court attached the greatest significance to Duncan's act of putting the mixture containing wine cooler in the baby's bottle and causing it to be fed to his son. Clearly, that was the most serious allegation against Duncan. Duncan argues that, given the low alcohol content of the mixture fed to his son, his child's life would not have been endangered even if he had consumed the entire contents of the bottle.

The question before us, then, is whether feeding a six-month-old infant approximately eight ounces of liquid containing 2.8% ethyl alcohol by volume is an act so gross, wanton, and culpable as to show a reckless disregard for human life. The Commonwealth asserts that "[i]t is beyond dispute that feeding alcohol to an infant is dangerous." Plainly, at some quantitative level, based on the alcoholic content and volume of the liquid ingested, feeding a six-month-old child liquid that

-

contains alcohol would, like driving an automobile in excess of one hundred miles an hour while being pursued by the police, constitute a danger to the child's life. In this case, however, there was no evidence presented to show that feeding a six-month-old child up to eight ounces of a liquid that is 2.8% ethyl alcohol by volume endangers the child's life. Such a conclusion would, therefore, have to be based on pure conjecture and speculation, rather than on the evidence or inferences reasonably drawn therefrom. Hence, we conclude the evidence did not support such a finding beyond a reasonable doubt by the trial court. See Thomas v. Commonwealth, 187 Va. 265, 272, 46 S.E.2d 388, 391 (1948) ("A conclusion of guilt must be supported by credible evidence and cannot rest upon conjecture or suspicion.").

We hold, therefore, that the Commonwealth's evidence was insufficient, as a matter of law, to prove beyond a reasonable doubt that Duncan's willful acts and omissions in caring for his child were so gross, wanton, and culpable as to show a reckless disregard for human life. Accordingly, we reverse Duncan's conviction of felony child abuse and neglect under Code § 18.2-371.1(B) and dismiss the indictment.

Reversed and dismissed.

-

Fitzpatrick, C.J., with whom Elder, Humphreys and Felton, JJ.,
 join, dissenting.

I respectfully dissent from the majority opinion, which
holds the evidence in this case insufficient to establish that
appellant's willful acts or omissions while caring for his son
showed a "reckless disregard for human life."

Code § 18.2-371.1(B) provides in pertinent part that "[a]ny
parent . . . responsible for the care of a child . . . whose
willful act or omission in the care of such child was so gross,
wanton and culpable as to show a reckless disregard for human
life shall be guilty of a Class 6 felony."

The evidence, viewed in the light most favorable to the
Commonwealth, proved appellant left his six-month-old baby with
people he had just met.  He provided no food or formula, and the
baby was not fed for more than seven hours.  The baby remained
at the home while appellant and others drank alcohol and used
illegal drugs.  Witnesses described appellant's appearance as
impaired with his eyes "glazed over."  Around midnight, the baby
started crying and appellant took the baby into a back bedroom
saying "I'm going to take care of the problem."  He placed the
baby on a futon, and a witness saw him lift the futon "as if it
was going towards the baby's body."  When he saw the witness, he
left the baby on the futon and went to the kitchen.  He returned
from the kitchen with a bottle and handed it to one of the girls
who lived at the house.  She started to feed it to the baby, but

- 11 -

noticed the liquid in the bottle was a "pinkish color" and smelled like wine cooler.  Later testing revealed the liquid in the bottle was alcohol.

The trial court rejected appellant's testimony and found:

> [Appellant] is not a believable witness.  I reject his testimony as to the explanation.  I find the Commonwealth's witnesses . . . to clearly show and prove beyond a reasonable doubt that the [appellant] took the baby back to the back bedroom and whatever happened on the sofa, he then is the one who goes to the kitchen area, he comes back with a bottle that has this clear pinkish substance in it, he gives the bottle to [a witness], then he walks out.
>
> Feeding alcohol to a six-month old baby is clear neglect.  Coupled with all the other acts, omissions and commissions that he did, I find the [appellant] guilty beyond a reasonable doubt of the felony charge.

This evidence established a day long series of actions that culminated in appellant's preparation of a bottle laced with alcohol to be fed to his six-month-old baby who had eaten nothing for the entire day.  This behavior shows more than mere indifference or negligence.  Appellant's acts of leaving the baby with people he barely knew, failing to provide food for more than seven hours, having the baby in a home where the people were using illegal drugs, and causing the baby to ingest alcohol were willful, wanton and showed a reckless disregard for human life.  Had the baby died as a result of ingesting the

alcohol laced drink, a manslaughter indictment would have been

the outcome.  Therefore, I would affirm appellant's conviction.

Kelsey, J., dissenting.

Crime is a "compound concept," generally requiring the "concurrence of an evil-meaning mind with an evil-doing hand." Morissette v. United States, 342 U.S. 246, 251-52 (1952). Every criminal statute, unless it imposes strict liability, must have two components: mens rea and actus reus. The former describes the criminal actor's state of mind, while the latter identifies the specific behavior deemed unlawful.

Underlying the disagreement between the majority and the dissent in this case, I believe, is an unstated — but altogether real — difference in opinion on how to deal with the apparent lack of an actus reus component in Code § 18.2-371.1(B). Subsection (B) of the statute reads:

> Any parent, guardian, or other person responsible for the care of a child under the age of eighteen whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

Code § 18.2-371.1(B). Subsection (B) criminalizes undefined acts or omissions that "show a reckless disregard for human life."

The majority interpolates an actus reus component from the "reckless disregard for human life" phrase. Focusing on this phrase alone, the majority assumes the "act or omission" condemned by the statute must be one that puts the victim at a probable risk of death. Under this interpretation, only lethal risks (not non-fatal risks of harm) fall within the scope of the statute. In

- 14 -

other words, if a parent puts a child at risk of being burned, cut, drugged, beaten, shot, or otherwise seriously injured — but the trauma would not have likely resulted in death — the parent has not violated Code § 18.2-371.1(B).

For two reasons, I do not believe the legislature intended the interpretation adopted by the majority. First, the phrase "reckless disregard for human life" is a statutory term of art that describes the requisite mens rea of the criminal actor, not the actus reus of the criminal act. The phrase has been used in many contexts, for many years, merely as a synonym for criminal negligence. We should presume that, by including this phrase in Code § 18.2-371.1(B), the legislature intended the traditional mens rea meaning ascribed to these words by the courts. Second, Code § 18.2-371.1 should be read as a whole and not as a series of freestanding phrases. A holistic approach leads us to subsection (A), which criminalizes "serious injury" to a child, as we search for the relevant actus reus of subsection (B).

I.

A.

When the General Assembly enacted Code § 18.2-371.1 in 1981, the statute included only the language now found in subsections (A) and (C). The 1981 statute criminalized behavior resulting in "serious injury to the life or health of such child," but did not address the felonious endangerment of a child short of actual

- 15 -

injury or death.  The General Assembly amended Code § 18.2-371.1 in 1993 to include a felony endangerment section, subsection (B), to address this omission.

The phrase "reckless disregard for human life," used in subsection (B), is a statutory term of art for criminal negligence.  See, e.g., Goodman v. Commonwealth, 37 Va. App. 374, 387, 558 S.E.2d 555, 562 (2002) ("A conviction for aggravated involuntary manslaughter in violation of Code § 18.2-36.1(B) requires proof, in addition, that the driver's 'conduct . . . was so gross, wanton and culpable as to show a reckless disregard for human life,' i.e., that the driver was criminally negligent." (emphasis added)).

The phrase has been used interchangeably with a variety of other phrases such as "disregard of another person's rights with reckless indifference to the consequences," Hubbard v. Commonwealth, 243 Va. 1, 15, 413 S.E.2d 875, 883 (1992), "reckless and utter disregard for the life and personal safety of others," Gallimore v. Commonwealth, 15 Va. App. 288, 294, 422 S.E.2d 613, 616 (1992), and "reckless or indifferent disregard of the rights of others," Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992).

We have equated the language "reckless disregard for human life" to the common law definition of criminal negligence enunciated in Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938), where the Virginia Supreme Court

defined criminal negligence in terms of "gross negligence," stating that conduct "is culpable or criminal when accompanied by acts of commission or omission of a wanton or wil[l]ful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated <u>to produce injury</u>, <u>or which make it not improbable that injury will be occasioned</u>, and the offender knows, or is charged with the knowledge of, the probable result of his acts."

<u>Wright v. Commonwealth</u>, 39 Va. App. 698, 703, 576 S.E.2d 242, 244 (2003) (quoting <u>Ellis v. Commonwealth</u>, 29 Va. App. 548, 557, 513 S.E.2d 453, 457-58 (1999), and <u>Bell</u> 170 Va. at 611-12, 195 S.E. at 681)) (emphasis added); <u>see</u> <u>also</u> <u>Banovitch v. Commonwealth</u>, 196 Va. 210, 220, 83 S.E.2d 369, 375 (1954).

We have never limited the <u>mens</u> <u>rea</u> of criminal negligence to risk-of-death scenarios, as has the majority in this case. Though some crimes with a <u>mens</u> <u>rea</u> of criminal negligence also require death, in each of those cases death is set forth separately in the <u>actus</u> <u>reus</u> component of the crime. For example in <u>Goodman</u>, we affirmed a conviction of involuntary DUI manslaughter under Code § 18.2-36.1 because the defendant's actions caused the death of another, as required under Code § 18.2-36.1(A).[1] We held that the

_____

[1] Code § 18.2-36.1 reads:

A. Any person who, as a result of driving under the influence in violation of clause (ii), (iii), or (iv) of § 18.2-266 or any local ordinance substantially similar thereto unintentionally causes the death of another person, shall be guilty of involuntary manslaughter.

- 17 -

defendant's actions were "aggravated" under subsection (B) because the "appellant was criminally negligent because the manner in which he operated his vehicle 'show[ed] a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury.'" Goodman, 37 Va. App. at 389, 558 S.E.2d at 562 (citations omitted).

Though death is an element of DUI manslaughter under Code § 18.2-36.1(A), the lethal nature of the risk does not figure into the aggravation analysis under Code § 18.2-36.1(B). Put another way, an aggravated DUI manslaughter conviction can be predicated on a showing that the defendant had criminal negligence mens rea coupled with an actus reus of "unintentionally caus[ing] the death of another person."

Consider too the DUI maiming statute, Code § 18.2-51.4(A). It provides:

> Any person who, as a result of driving while intoxicated in violation of § 18.2-266 or any local ordinance substantially similar thereto in a manner so gross, wanton and culpable as to show a reckless disregard for human life, unintentionally causes the serious bodily injury of another person resulting in permanent and significant

---

B. If, in addition, the conduct of the defendant was so gross, wanton and culpable as to show a reckless disregard for human life, he shall be guilty of aggravated involuntary manslaughter, a felony punishable by a term of imprisonment of not less than one nor more than twenty years, one year of which shall be a mandatory, minimum term of imprisonment.

> physical impairment shall be guilty of a
> Class 6 felony.

Code § 18.2-51.4(A). In this statute, as with the DUI manslaughter statute, the legislature included the same mens rea language ("reckless disregard for human life") used in the child endangerment statute. The actus reus requirement of the DUI maiming statute, however, requires a specific form of "serious bodily injury." Nothing in this statute or in our cases interpreting it requires a fact finder to analyze the defendant's behavior in the abstract to determine if it exposed the victim to a lethal risk of harm before considering the actual, non-fatal harm inflicted.

For these reasons, I believe the phrase "reckless disregard for human life" should be interpreted as a mens rea requirement synonymous with criminal negligence. The phrase does not, in my judgment, include any actus reus requirement limiting the scope of the statute only to lethal risks of harm. By interpreting the statute to include such a limitation, the majority has "conflated the two theoretical pillars of criminal law —— actus reus and mens rea." United States v. Bartley, 230 F.3d 667, 677 (4th Cir. 2000) (Wilkinson, C.J., dissenting).

B.

In legal codes, as in ordinary conversation, "a word is known by the company it keeps." Sprietsma v. Mercury Marine, 537 U.S. ___, 123 S. Ct. 518, 526 (2002) (quoting Gustafson v. Alloyd, Co.,

- 19 -

513 U.S. 561, 575 (1995)).  The same can be said of a statutory phrase.  "Under basic principles of statutory construction, we consider all relevant provisions of a statute and do not isolate particular words or phrases."  Lee County v. Town of St. Charles, 264 Va. 344, 348, 568 S.E.2d 680, 682 (2002); see also Lucy v. County of Albemarle, 258 Va. 118, 129, 516 S.E.2d 480, 485 (1999) ("Statutes which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as in pari materia.").  We thus consider "the entire body of legislation and the statutory scheme to determine the 'true intention of each part.'"  McCray v. Commonwealth, 37 Va. App. 202, 204, 556 S.E.2d 50, 51 (2001) (citation omitted).  And despite the strict construction afforded penal statutes, a defendant "is not 'entitled to a favorable result based upon an unreasonably restrictive interpretation of the statute.'"  Id.

Following these principles, Code § 18.2-371.1(B)'s child endangerment provision should be read in harmony with subsection (A), which addresses acts or omissions resulting in "serious injury to the life or health of such child."  Read this way, Code § 18.2-371.1 contains a dichotomy between behavior causing serious harm to a child in subsection (A) and behavior creating a realistic risk of serious harm to a child in subsection (B).  In this sense, subsection (B) equally condemns a parent who, for example, exposes a child through criminal negligence to the risk of a nonfatal gunshot wound every bit as much as one who exposes a

- 20 -

child to a lethal one.  It should be unnecessary to have to prove that the wound, had it been inflicted, would have likely killed the child.  By incorporating the actus reus in subsection (A), subsection (B)'s endangerment provision limits liability to criminal negligence that creates a realistic risk of "serious harm to the life or health" of the child.

## II.

When faced with a challenge to the sufficiency of the evidence, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it."  Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002) (citations omitted); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (en banc).

When a jury decides the case, Code § 8.01-680 requires that "we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make."  Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (en banc).  "We let the decision stand unless we conclude no rational juror could have reached that decision."  Id.  The same standard applies when a trial judge sits as the fact finder because "the court's judgment is accorded the same weight as a jury verdict."

Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001).[2]

In other words, when faced with a challenge to the sufficiency of the evidence, a reviewing court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted). It asks instead whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). This deference applies not only to the historical facts themselves, but the inferences from those facts as well. "The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." Hancock v. Commonwealth, 12 Va. App. 774, 783, 407 S.E.2d 301, 306 (1991).

Governed by this standard of review, the evidence satisfies the sufficiency test. A rational fact finder could have found

---

[2] Unless the fact finder acted unreasonably, we consider it our duty not to "substitute our judgment for that of the trier of fact, even were our opinion to differ." Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002) (quoting Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)); see also Pease, 39 Va. App. at 355, 573 S.E.2d at 278; Harris v. Commonwealth, 38 Va. App. 680, 691, 568 S.E.2d 385, 390 (2002). Thus, on appeal from a bench trial, if "reasonable jurists could disagree about the probative force of the facts, we have no authority to substitute our views for those of the trial judge." Campbell v. Commonwealth, 39 Va. App. 180, 186, 571 S.E.2d 906, 909 (2002).

Duncan guilty under Code § 18.2-371.1(B). Duncan left a six-month-old baby with strangers he had met briefly only the day before. During his seven-hour hiatus, Duncan failed to provide any nutrition or hydration for the infant. Upon returning, Duncan failed to feed the infant for at least another two hours. When the baby began "crying and making a lot of noise" after having no nourishment or hydration for about ten hours, Duncan stated he would "take care of the problem" and willfully gave the infant a bottle containing alcohol, a known diuretic. Had the child slept the rest of the night from the alcohol, the next day he would have gone 20 hours or more without any nutrition or hydration at all. Even Duncan — who denied doing anything of the kind — seemed to understand the danger of giving alcohol to a dehydrated six-month-old infant, when he declared: "I would never do that to my son. I would never do that."[3]

I agree completely with Chief Judge Fitzpatrick that "[h]ad the baby died as a result of ingesting the alcohol laced drink, a manslaughter indictment would have been the outcome." Ante at 13. I thus cannot say, as the majority does, that the trial court

_____

[3] Duncan failed to move to strike at the close of the Commonwealth's case and failed to make a formal motion to strike at the conclusion of all evidence. Though Duncan's counsel argued that the evidence did not prove Duncan was the one who put alcohol in the infant's bottle, counsel never once argued that feeding this amount of alcohol to a dehydrated infant could not constitute, as a matter of law, felony neglect under Code § 18.2-371.1(B), the issue decided by the majority.

erred as a matter of law in finding Duncan guilty of felony child endangerment under Code § 18.2-371.1(B).

I thus respectfully dissent.

Monday                    30th

September, 2002.


Carlton Wendell Duncan,                                    Appellant,

 against        Record No. 1060-01-1
                Circuit Court No. CR11514-00

Commonwealth of Virginia,                                  Appellee.


Upon a Petition for Rehearing En Banc

Before the Full Court


On September 9, 2002 came the appellee, by the Attorney General of Virginia, and filed a petition praying that the Court set aside the judgment rendered herein on August 27, 2002, and grant a rehearing en banc thereof.

On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on August 27, 2002 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as an addendum to the opening brief upon rehearing en banc a copy of the opinion previously rendered by the Court in this matter. It is further ordered that

the appellee shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.

                        A Copy,

                           Teste:

                                   Cynthia L. McCoy, Clerk
                              By:

                                      Deputy Clerk

COURT OF APPEALS OF VIRGINIA

Present: Judges Bray, Bumgardner and Clements
Argued at Chesapeake, Virginia


CARLTON WENDELL DUNCAN

MEMORANDUM OPINION[*] BY
v.   Record No. 1060-01-1          JUDGE JEAN HARRISON CLEMENTS
                                        AUGUST 27, 2002
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG
AND COUNTY OF JAMES CITY
Thomas B. Hoover, Judge

LeeAnn N. Barnes for appellant.

Virginia B. Theisen, Assistant Attorney
General (Randolph A. Beales, Attorney
General, on brief), for appellee.


Carlton Wendell Duncan was convicted in a bench trial of
felony child abuse and neglect in violation of Code
§ 18.2-371.1(B). On appeal, he contends the evidence was
insufficient to sustain the conviction. We agree and reverse the
conviction.

As the parties are fully conversant with the record in this
case and because this memorandum opinion carries no precedential
value, this opinion recites only those facts and incidents of the
proceedings as necessary to the parties' understanding of the
disposition of this appeal.

---

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

When the sufficiency of the evidence is challenged on appeal, we review the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1997). "In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Watkins v. Commonwealth, 26 Va. App. 335, 349, 494 S.E.2d 859, 866 (1998). We are further mindful that the "credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." Crawley v. Commonwealth, 29 Va. App. 372, 375, 512 S.E.2d 169, 170 (1999). We will not disturb the conviction unless it is plainly wrong or unsupported by the evidence. Sutphin v. Commonwealth, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

Here, viewed in the light most favorable to the Commonwealth, the evidence established that, on June 12, 2000, around 3:30 p.m., Jennifer Dansby returned home from work to find Michelle Cribbs, several friends, and Duncan's six-month-old son there. Duncan was not there. Dansby shared the home with Cribbs and Elizabeth Nemo. She had first met Duncan and his baby the day before when Dansby's ex-housemate had invited him to Dansby's house. The baby was awake when Dansby got home but would doze off as Dansby and the

others took turns holding him and playing with him.  There was no baby food or formula in the house, so Dansby and her friends were unable to feed the child.  According to Dansby, nobody fed the child from 3:30 p.m. until 11:00 p.m.

Nemo arrived home at 9:30 p.m.  Later in the evening, an impromptu party began as other friends arrived and people started drinking beer and using illegal drugs.  Dansby, her housemates, and her friends continued to take turns holding the baby, passing him around.  Duncan arrived at the house around 10:30 p.m., bringing a bag of marijuana with him.  Nemo noticed that his eyes were "glazed over" and the whites of his eyes were yellow.  Duncan began drinking with the group.  When the subject of babies came up, Duncan started talking about women he had impregnated and the abortions they had had.  Later, Duncan took the baby from Nemo, put him on the couch, and, holding him by his hands, lifted him up off the couch.  The baby started crying.

Around midnight, the baby became fussy and started crying loudly.  Duncan, saying he would "take care of the problem," took the child from his carriage in the living room and carried him into the bathroom, and then into a back bedroom.  Nemo, who was concerned about the baby, followed them.  Looking into the bedroom, she saw the baby lying on a futon.  Duncan was sitting next to the futon, lifting it "as if it was going towards the baby's body."  When Duncan saw Nemo, he put the futon down and

told her he was looking for a pacifier.  Duncan left the room, and Nemo picked up the baby, who was still crying.

Duncan went into the kitchen.  Dansby heard him open the refrigerator door, which was "odd," she thought, because there was only beer and wine coolers in the refrigerator.  Approximately five minutes later, Duncan came out of the kitchen with a baby bottle, which he took to the back room and gave to Nemo.  Nemo started feeding the child, and Duncan left the room and then went outside.

While feeding the baby, Nemo went into the living room and sat down with her friends.  Nemo then noticed that the liquid in the baby bottle had a "pinkish color" and smelled like wine cooler.  After a friend tasted the liquid in the bottle and confirmed that it tasted of alcohol, Dansby, who described the liquid as having a "milky pinkish color," called the hospital and the police.  She then took the baby bottle, which was a little more than half full, and hid it in the microwave oven until the police arrived.  While in the kitchen, Dansby noticed that a bottle of wine cooler was missing from the refrigerator.  She found an open bottle of wine cooler that had not been there before on the kitchen counter behind some fast-food bags of trash.  It had approximately three inches of liquid missing from the top.  The contents of the bottle were "pink."

Approximately fifteen minutes later, Duncan, who was unaware the police had been called, came back inside to check on his

child.  He sat on the couch next to Nemo, who continued to hold the baby until the police came.

When the police arrived, Officer Nacastro noticed that Duncan had "bloodshot eyes," his speech was "slightly mumbled," and he smelled "of intoxicant[s]."  The police took the baby bottle and the opened bottle of wine cooler for analysis.  Laboratory tests revealed that the liquid in the twelve-ounce bottle of wine cooler was 3.2% ethyl alcohol by volume.  The liquid in the eight-ounce baby bottle, which the police noted was "whitish [with a] little pinkish color in that," was 2.8% ethyl alcohol by volume.

At trial, Duncan denied putting any alcohol in his son's baby bottle.  He said he picked up the baby bottle from the kitchen table and gave it to Nemo, but did not know it contained wine cooler.  He also testified that he had fed the baby apple raisin cereal earlier in the evening.  He also claimed he put his son on the futon in the back bedroom and rubbed his back so he could go to sleep.

Code § 18.2-371.1(B) provides that "[a]ny parent, guardian, or other person responsible for the care of a child under the age of eighteen whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony."

After hearing the evidence and argument of counsel, the trial judge stated:

> I find that Mr. Duncan is not a
> believable witness.  I reject his testimony
> as to the explanation.  I find the
> Commonwealth's witnesses, again Ms. Nemo and
> Ms. Dansby together with Officer Nacastro, to
> clearly show and prove beyond a reasonable
> doubt that the defendant took the baby back
> to the back bedroom and whatever happened on
> the [futon], he then is the one who goes to
> the kitchen area, he comes back with a bottle
> that has this clear pinkish substance in it,
> he gives the bottle to Ms. Nemo, then he
> walks out.
>
> Feeding alcohol to a six-month baby is
> clear neglect.  Coupled with all the other
> acts, omissions and commissions that he did,
> I find the defendant guilty beyond a
> reasonable doubt of the felony charge.

On appeal, Duncan does not challenge the sufficiency of the evidence to show that he committed certain improper acts and omissions in the care of his son and that such acts and omissions were willful.  In addition, he concedes that such willful acts and omissions could be construed as being irresponsible, derelict, and negligent.  He argues, however, that, even viewing the evidence in the light most favorable to the Commonwealth, his willful acts and omissions were not so gross, wanton, and culpable as to show a reckless disregard for human life.

The Commonwealth argues that Duncan's acts and omissions in the care of his son support his conviction.  Specifically, the Commonwealth asserts that Duncan's leaving the child in the care of people he had known for just a day; failing to feed, or make sure someone else fed, the child for more than seven hours; returning to Dansby's home intoxicated and in possession of

marijuana; "put[ting] the child on a futon and then lift[ing] the futon until he was caught" by Nemo; and, most significantly, causing Nemo, unbeknownst to her, to feed wine cooler to the baby was conduct so gross, wanton and culpable as to show a reckless disregard for the life of his six-month-old son. We disagree with the Commonwealth.

Plainly, Duncan was negligent in caring for his child. His conduct was inexcusable and cannot be condoned. A finding of negligence, however, is not enough, by itself, to sustain a conviction for criminal abuse and neglect of a child under Code § 18.2-371.1. See Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 457 (1999) (holding that "something more than negligence must be proved beyond a reasonable doubt to support [defendant's] conviction" of criminal child neglect). To sustain Duncan's conviction in this case, the Commonwealth had to prove beyond a reasonable doubt that Duncan committed a willful act or omission in the care of his son that was "so gross, wanton, and culpable as to show a reckless disregard" for the child's life. Code § 18.2-371.1(B). In Snow v. Commonwealth, 33 Va. App. 766, 775, 537 S.E.2d 6, 11 (2000), we held that the defendant's act of driving a car with children in it in excess of one hundred miles per hour while trying to elude the police was not only illegal but "dangerous," and, thus, constituted conduct "so gross, wanton, and culpable as to show a reckless disregard for human life." The

same cannot be said, however, of the willful acts and omissions before us in this case.

Here, although Duncan, as the Commonwealth notes, left his son with women he had known for only a day, the evidence supports the trial court's finding that the women found "the baby interesting and cute" and enjoyed "looking after" him. Indeed, they continued to play with and hold the child even after Duncan returned to the women's house. In addition, Duncan did interact on occasion with his son upon his return to the house and, despite his apparent intoxication and possession of illicit drugs, responded to him when the child became fussy and cried loudly.

Furthermore, although Nemo testified that she was concerned for the baby's safety when Duncan took the child to the back bedroom after announcing he would "take care of the problem," we find, on the evidence presented, that her assignment of ill will to Duncan was purely speculative, as was her perception that Duncan intended to harm the child when she saw him lift the futon. The trial court correctly gave little, if any, weight to such conjecture in reaching its decision.

Likewise, the evidence did not show that Duncan's failure to feed his son for seven and a half hours constituted conduct so gross, wanton, and culpable as to show a reckless disregard for the child's life, particularly as there was no evidence that the baby was hungry or otherwise in distress during that period of time. In fact, the evidence showed that, when the baby did become

fussy and start to cry loudly, Duncan took steps to feed him, albeit with a bottle containing wine cooler—which brings us to the crux of this appeal.

In finding Duncan guilty of violating Code § 18.2-371.1(B), the trial court attached the greatest significance to Duncan's act of putting wine cooler in the baby's bottle and causing it to be fed to his son. Clearly, that was the most serious allegation against Duncan. Duncan argues that, given the low alcohol content of the mixture fed to his son, his child's life would not have been endangered even if he had consumed the entire contents of the bottle.

The question before us, then, is whether feeding a six-month-old infant approximately eight ounces of liquid containing 2.8% ethyl alcohol by volume is an act so gross, wanton, and culpable as to show a reckless disregard for human life. The Commonwealth asserts that "[i]t is beyond dispute that feeding alcohol to an infant is dangerous." Plainly, at some quantitative level, based on the alcoholic content and volume of the liquid ingested, feeding a six-month-old child liquid that contains alcohol would, like driving an automobile in excess of one hundred miles an hour while being pursued by the police, constitute a danger to the child's life. In this case, however, there was simply no evidence presented to show that feeding Duncan's six-month-old son up to eight ounces of a liquid that was 2.8% ethyl alcohol by volume put the child's life in danger.

Hence, we conclude that the evidence did not support such a finding beyond a reasonable doubt by the trial court.

We hold, therefore, that the Commonwealth's evidence was insufficient, as a matter of law, to prove beyond a reasonable doubt that Duncan's willful acts and omissions in caring for his child were so gross, wanton, and culpable as to show a reckless disregard for human life.  Accordingly, we reverse Duncan's conviction of felony child abuse and neglect under Code § 18.2-371.1(B) and dismiss the indictment.

<u>Reversed and dismissed.</u>