UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Lorish and Callins
Argued at Richmond, Virginia

HARDIK SURESCHCHANDRA PATEL

MEMORANDUM OPINION* BY
v.        Record No. 0201-21-2        JUDGE DOMINIQUE A. CALLINS
JULY 12, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge

Jonathan P. Sheldon (Sheldon & Flood, PLC, on briefs), for
appellant.

Sharon M. Carr, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.

Hardik Sureschchandra Patel appeals his convictions for eight counts of distributing a

Schedule I or II controlled substance, one count of distributing a Schedule III controlled

substance, and eight counts of distributing a Schedule IV controlled substance under Code

§ 18.2-248.  Patel contends that (1) his double jeopardy and due process rights under the United

States and Virginia Constitutions were violated because he was retried after the prosecution

caused a mistrial, and (2) the circuit court violated his due process rights under the United States

and Virginia Constitutions by failing to grant his motion to strike because the evidence was

insufficient as a matter of law to prove that he sold drugs to an individual who did not have a

prescription for those drugs.  For the following reasons, we disagree and affirm Patel's

convictions.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

BACKGROUND

A.  Controlled Drug Purchases

In the spring of 2018, Patel, then pharmacist and owner of HnR Pharmacy in Fredericksburg, was the subject of a sting operation involving a confidential informant, Timothy Urbani.  Urbani, a customer of HnR Pharmacy with a personal history of felony convictions and drug abuse problems, informed Stafford County Detective Shawn Monaghan that he could purchase drugs at HnR Pharmacy without a prescription.  Detective Monaghan relayed this information to Special Agent Tony Chrisley of the Virginia State Police, who, along with Detective Monaghan, was a member of a regional narcotics task force involving local Stafford police, Virginia State Police, and the United States Drug Enforcement Administration ("DEA").  Urbani agreed to work with Special Agent Chrisley as an informant performing controlled drug purchases at HnR Pharmacy.

Urbani performed eight controlled drug purchases from Patel, with the first taking place on April 9, 2018.  Before each controlled drug purchase, law enforcement provided Urbani with cash to pay for the drugs and equipped him with surveillance equipment that captured audio and video recordings of his drug purchases from Patel.

In the first controlled drug purchase on April 9, 2018, Urbani purchased oxymorphone, a Schedule II drug, and clonazepam, a Schedule IV drug, from Patel in two unlabeled pill bottles.  During this purchase, Patel asked Urbani "are you wearing wire?" and later told Urbani that "you're getting a f—ing deal."  In the second controlled purchase on April 26, 2018, Urbani purchased oxymorphone and clonazepam in two pill bottles, only one of which was labeled.  During this purchase, Patel insisted that he and Urbani communicate through written notes to avoid being detected by the pharmacy camera system.  In the third controlled purchase on May 2, 2018, Urbani purchased oxymorphone and clonazepam in one unlabeled pill bottle.  During this

purchase, Patel and Urbani communicated through written notes, and Patel told Urbani "if anything happens, I didn't do it" and again asked Urbani if he was wearing a wire. In the fourth controlled purchase on May 9, 2018, Urbani purchased oxymorphone and clonazepam in one unlabeled pill bottle.

In the fifth controlled purchase on May 17, 2018, Urbani purchased oxymorphone and clonazepam in one unlabeled pill bottle. During this purchase, Patel told Urbani that he wanted to stop at some point because the pharmacy was about to be audited. In the sixth controlled purchase on May 25, 2018, Urbani purchased methadone, a Schedule II drug, and clonazepam in three pill bottles, one of which was unlabeled. During this purchase, Urbani managed to retain a written note that he had used to communicate with Patel, which he later provided to Special Agent Chrisley. During the seventh controlled purchase on June 1, 2018, Urbani purchased methadone and clonazepam in one labeled pill bottle. During the eighth and final controlled purchase on June 21, 2018, Urbani purchased methadone, clonazepam, and buprenorphine/naloxone, a Schedule III drug, in one labeled pill bottle.

The DEA eventually executed a search warrant on HnR Pharmacy and seized hard drives containing surveillance recordings and digital pharmacy records.[2] Task force officers took Patel into custody and brought him to the narcotics task force office in Fredericksburg, where Detective Monaghan and Special Agent Chrisley read Patel his *Miranda*[3] rights before beginning their interview. A DEA agent was also present. During the interview, Patel answered questions about his practices as a pharmacist and the practices of other pharmacists, declining to answer

---

[2] Patel filed two motions to compel the Commonwealth to turn over the data in the hard drives seized by the DEA, asserting that the hard drives contained potentially exculpatory information. In response, the Commonwealth maintained that it was not involved in the DEA's separate investigation of HnR Pharmacy and could not obtain access to the hard drives. Accepting the Commonwealth's representations, the circuit court denied both motions to compel.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

only when asked specifically whether he sold drugs to patients without a prescription. At the end of the interview, Patel was formally arrested. In his amended indictments, Patel was charged with eight counts of distributing a Schedule I or II controlled substance, one count of distributing a Schedule III controlled substance, eight counts of distributing a Schedule IV controlled substance, and one count of money laundering.[4]

## B. The First Trial

Patel's first trial began on May 1, 2019, in the Circuit Court of the City of Fredericksburg. During its case-in-chief, the Commonwealth admitted over forty exhibits without objection. The exhibits consisted mainly of the audio and video recordings of Urbani's controlled drug purchases, photos of the pills and pill bottles recovered from the purchases, photos of the cash used to make the purchases, and certificates of analysis prepared for the drugs that were purchased. Defense counsel stipulated to the expertise of the Commonwealth's two expert witnesses, and there were no significant interruptions or major setbacks to any aspect of the Commonwealth's presentation of its evidence.

At the close of the second day of trial, the Commonwealth called Detective Monaghan as its ninth witness. During direct examination, the prosecutor attempted to play a redacted version of a video recording of Patel's interview at the narcotics task force office ("DEA interview") to avoid revealing what the prosecutor considered irrelevant information about the DEA's involvement in the case. In objecting to the redacted version, defense counsel requested that the entire video be played for the court. The prosecutor responded, "I'll be more than happy to play the entire video. I was just putting that out in fairness to the Defendant." After the entire video of the DEA interview was played for the court, the prosecutor continued his direct examination:

> [PROSECUTOR]: During that interview, you made commentary
> about other agencies . . . having involvement. Do you have any

---

[4] Patel does not challenge his money laundering conviction on appeal.

personal knowledge about any buys that occurred through the DEA?

[DETECTIVE MONAGHAN]: My understanding is the DEA did two purchases of their own from HnR Pharmacy from Mr. Patel.

Upon hearing Detective Monaghan's answer, defense counsel moved for a mistrial, arguing that this was the first time he had heard about any separate controlled drug purchases conducted by the DEA and that the revelation of this information to the jury was incurably prejudicial to Patel's affirmative defense of entrapment. In response, the prosecutor stated that he did not know what Detective Monaghan's answer would be when he asked the question. He thought the question warranted considering defense counsel's repeated attempts to bring up the DEA's involvement in the case, both during cross-examination of the Commonwealth's witnesses and by requesting that the entire DEA interview be played. The circuit court declared a mistrial.

Several months later, Patel moved to dismiss his indictments on double jeopardy grounds, arguing that "the government cannot intentionally create a mistrial and then benefit from it for whatever reason," nor "create a mistrial so recklessly that it's tantamount to intentionally creating a mistrial." In response, the Commonwealth asserted that it "did not stand to benefit from, and therefore had no reason to deliberately provoke a defense motion for mistrial" and that "the Commonwealth did not ask the question in bad faith but rather from a genuine and justifiable belief that defense counsel had 'opened the door' to inquiry about the basis for the independent DEA investigation and search warrant." At a hearing on the motion, the circuit court ruled that the prosecutor did not intentionally provoke a mistrial: "What the transcript doesn't reflect and what the [c]ourt witnessed was the body language of [the prosecutor]" and that "making a mistake in the course and the heat of a trial is not necessarily reckless. It certainly doesn't show necessarily ill intent." The circuit court denied the motion to dismiss.

## C. The Second Trial

Patel's retrial began on November 4, 2020, with new defense counsel. As one of its exhibits, the Commonwealth entered a "Prescription Monitoring Program" ("PMP") report showing all legitimate prescriptions that Urbani had filled during the relevant period from January 1 to July 11, 2018. The Commonwealth called Susan Beckmann, a pharmacy inspector with the Virginia Department of Health Professions, who testified to the many statutory and regulatory violations that Patel committed during the controlled drug purchases, such as failing to affix labels to pill bottles and mixing pills of different types together in the same bottle. Beckmann also testified that a pharmacist is required to update a patient's data in the PMP system every time the pharmacist fills a prescription for a patient and that Urbani's PMP report did not show that he had ever filled prescriptions for oxymorphone, clonazepam, methadone, or buprenorphine/naloxone. On cross-examination, Beckmann conceded that a PMP report does not track which prescriptions have been originally issued to patients, but only tracks prescriptions as they are filled by a pharmacy.

Urbani was eventually called to testify by the Commonwealth. When asked if he ever had a prescription for clonazepam, Urbani initially testified that "I think I did have one for [c]lonazepam. I think that's what it was, the name of the pill. . . . I don't remember if I filled the [c]lonazepam [at HnR pharmacy] or at Giant. I'll be honest, I don't remember." Urbani was then shown his PMP report, and he then testified that he had confused clonazepam with lorazepam, a drug that his PMP report showed he had filled at Giant under a valid prescription. Later in his testimony, Urbani emphasized that he never had a prescription for clonazepam, nor for any of the other drugs that were the subject of Patel's charges.

After the Commonwealth rested, defense counsel moved to strike, arguing that Urbani could not testify conclusively as to what prescriptions he had. The circuit court overruled the

motion to strike. Patel then testified in his own defense, stating that Urbani had prescriptions on file at HnR Pharmacy, but that he could not remember which specific drugs those prescriptions were for. Defense counsel made a renewed motion to strike, which again was overruled by the circuit court. The jury, rejecting Patel's affirmative defense of entrapment, found Patel guilty on all charges, and he received an active sentence of four years and eight months of imprisonment. This appeal followed.

ANALYSIS

I. Double Jeopardy[5]

Under the United States and Virginia Constitutions, a criminal defendant may not be subjected to repeated prosecutions for the same offense. U.S. Const. amend. V; Va. Const. art. I, § 8. The protection against double jeopardy "recognizes the vast power of the sovereign, the ordeal of a criminal trial, and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek." *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018). However, "the Clause was not written or originally understood to pose 'an insuperable obstacle to the administration of justice' in cases where 'there is no semblance of [these] type[s] of oppressive practices.'" *Id.* (alterations in original) (quoting *Wade v. Hunter*, 336 U.S. 684, 688-89 (1949)). "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. 667, 675-76 (1982).

---

[5] We disagree with the Commonwealth's argument that Patel's double jeopardy claim is procedurally defaulted under Rule 5A:18. By moving to dismiss on double jeopardy grounds and alleging intentional prosecutorial misconduct, Patel stated his objection with reasonable certainty and therefore preserved this issue on appeal. Rule 5A:18. Moreover, defense counsel took no actions that expressly waived this objection. *See Brown v. Commonwealth*, 279 Va. 210, 217 (2010) ("[I]f a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal.").

"Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676. The Supreme Court in *Kennedy* "rejected an attempt 'to broaden the test from one of *intent* to provoke a motion for a mistrial to a more generalized standard of "bad faith conduct" or "harassment" on the part of the . . . prosecutor.'" *Pease v. Commonwealth*, 39 Va. App. 342, 348 (2002) (*en banc*) (alteration in original) (quoting *Kennedy*, 456 U.S. at 674), *aff'd*, 266 Va. 397 (2003). "In *Kennedy*, the Supreme Court made it clear that the exclusive focus should not be on the fact of prosecutorial error or on the impact of such error upon a defendant, but only on the intent of the prosecutor in committing the error." *Robinson v. Commonwealth*, 17 Va. App. 551, 553, *aff'd en banc*, 18 Va. App. 814 (1994). "Without the requisite intent . . . gross prosecutorial misconduct will not satisfy the exception set forth in *Kennedy*." *Id.* at 555.

"Whether a prosecutor 'intended to "goad" the defendant into moving for a mistrial' requires an assessment of the 'objective facts and circumstances of the case.'" *Bennefield v. Commonwealth*, 21 Va. App. 729, 736 (1996) (quoting *Kennedy*, 456 U.S. at 675-76). Thus, "[t]he question of whether prosecutorial misconduct was intended to provoke the defendant into seeking a mistrial is a factual question that is appropriately decided by the trial court." *Robinson*, 17 Va. App. at 555 (quoting *State v. Diaz*, 521 A.2d 129, 133 (R.I. 1987)). "The court's finding concerning the prosecutor's intent is . . . a factual one which we must accept unless it is clearly erroneous." *Kemph v. Commonwealth*, 17 Va. App. 335, 343 (1993) (quoting *United States v. Borromeo*, 954 F.2d 245, 247 (4th Cir. 1992)). "Under familiar principles of appellate review,

the trial court's findings of fact are binding unless they are without evidence to support them." *Weaver v. Commonwealth*, 25 Va. App. 95, 103 (1997).[6]

Here, it is clear that even if the prosecutor's question to Detective Monaghan about separate DEA controlled purchases was borne of frustration and amounted to harassment, bad faith, or even gross prosecutorial misconduct, this would still be insufficient—without more—to sustain the conclusion that the prosecutor intended to cause a mistrial to subvert Patel's double jeopardy protections. *See Kennedy*, 456 U.S. at 675-76; *Pease*, 39 Va. App. at 348; *Robinson*, 17 Va. App. at 553-55 (upholding the circuit court's factual finding that the prosecutor's "injecting [of] clearly improper issues at the first trial" was "highly improper," but, "[w]ithout the requisite intent," even "gross prosecutorial misconduct" does not bar retrial of a defendant); *Bennefield*, 21 Va. App. at 736 (upholding the circuit court's factual finding that the prosecutor's last minute disclosure of evidence and failure to review police documents, while constituting "gross negligence" and "near total indifference . . . to Court Orders," did not show intent to provoke a mistrial).

Patel theorizes that the prosecutor, responding to defense counsel's request to play the entire DEA interview, suddenly formed the intent to cause a mistrial out of fear that the jury might discover that the DEA had seized and failed to return the HnR Pharmacy hard drives. We are unpersuaded. This revelation, had it occurred, would not have harmed the Commonwealth's

---

[6] This deferential standard of review is not to be confused with the standard of review for other types of double jeopardy violations. When a defendant alleges a double jeopardy violation on the grounds of multiple punishment for the same offense or collateral estoppel, we review these cases *de novo*. *See, e.g.*, *Davis v. Commonwealth*, 57 Va. App. 446 (2011); *Dalo v. Commonwealth*, 37 Va. App. 156 (2001); *Hall v. Commonwealth*, 69 Va. App. 437 (2018); *Currier v. Commonwealth*, 65 Va. App. 605 (2015), *aff'd*, 292 Va. 737 (2016), *aff'd*, 138 S. Ct. 2144 (2018). When a defendant alleges a double jeopardy violation asserting that the circuit court erred in finding manifest necessity to declare a mistrial, we review these cases for abuse of discretion. *See, e.g.*, *Prieto v. Commonwealth*, 278 Va. 366 (2009); *Mack v. Commonwealth*, 177 Va. 921 (1941).

case-in-chief in any significant respect, nor would it have curtailed the probative value of the Commonwealth's evidence.[7] This does not present a situation where the "prosecutor was trying this case and got to a certain point and thought he was going to lose it," *Pease*, 39 Va. App. at 348, nor was this a situation where, in the middle of trial, it "appeared that the [Commonwealth's] evidence would be insufficient to convict," *Arizona v. Washington*, 434 U.S. 497, 507 (1978) (explaining how the prohibition against double jeopardy originally evolved to condemn the "abhorrent" practice of English judges "exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict").

We note that the circuit court judge who oversaw Patel's first trial was the same judge who decided Patel's motion to dismiss for double jeopardy, a factor that we have found significant in the past. *See Bennefield*, 21 Va. App. at 737 ("For that reason, he was better able to determine how the prosecution's case was progressing, and whether the prosecutor had any motivation or desire to cause a mistrial so as to gain a more favorable position at a new trial."). We also note as significant the fact that the prosecutor argued strenuously in opposition to defense counsel's motion for a mistrial, which suggests that the prosecutor did not intend to cause a mistrial. *See Kemph*, 17 Va. App. at 343 (noting that "[t]he prosecutor . . . opposed the granting of a mistrial, suggesting that he lacked a purposeful intent to bring about the mistrial").

In conclusion, we hold that the circuit court's factual finding that the prosecutor did not intentionally provoke a mistrial was supported by the objective facts and circumstances of this case. Thus, by being subjected to a retrial, Patel's "valued right to have his trial completed by a particular tribunal" was properly "subordinated to the public's interest in fair trials designed to

---

[7] The only harm to the Commonwealth's case-in-chief would have come from the revelation of the specific contents of the files in the hard drives themselves—assuming, of course, that these files did in fact contain exculpatory information.

end in just judgments." *Wade*, 336 U.S. at 689. Accordingly, Patel's constitutional protections against double jeopardy were not violated.

## II. Motion to Strike

Code § 18.2-248(A) provides that "[e]xcept as authorized in the Drug Control Act . . . it shall be unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance." In turn, Code § 54.1-3410(A) of the Drug Control Act provides that "[a] pharmacist, acting in good faith, may sell and dispense drugs and devices to any person pursuant to a prescription of a prescriber." Code § 54.1-3410(A)(1) further states that "[a] drug listed in Schedule II shall be dispensed only upon receipt of a written prescription," and Code § 54.1-3410(B) states that "[a] drug controlled by Schedules III through VI . . . shall be dispensed upon receipt of a written or oral prescription." When dispensing a Schedule II, III, or IV drug, a pharmacist must "affix to the container in which such drug is dispensed, a label" showing, among other things, "the date of initial filing; [the pharmacist's] name and address, or the name and address of the pharmacy; the name of the patient . . . ; [and] the name of the prescriber by whom the prescription was written." Code § 54.1-3410(A)(3), (B)(2). Oxymorphone and methadone are classified as Schedule II drugs, buprenorphine/naloxone is classified as a Schedule III drug, and clonazepam is classified as a Schedule IV drug. Code §§ 54.1-3448, -3450, and -3452.

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013). "A circuit court must rule on a motion to strike based on the presumption that the jury will believe all the evidence favorable to the [Commonwealth], as well as all reasonable inferences that a jury might draw therefrom in favor of the [Commonwealth]." *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). Further, "[w]hen evaluating a motion to strike, the circuit court must not judge the weight or credibility of

- 11 -

evidence, because to do so 'would invade the province of the jury.'" *Id.* (quoting *Tahboub v. Thiagarajah*, 298 Va. 366, 371 (2020)). A trial court should grant a motion to strike "only when it is conclusively apparent that [the Commonwealth] has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the [Commonwealth] as being without evidence to support it." *Avent v. Commonwealth*, 279 Va. 175, 198-99 (2010) (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 455 (2007)).

Patel contends that the circuit court erred in overruling his motion to strike because the Commonwealth's evidence was insufficient as a matter of law to establish that Urbani did not have prescriptions for the drugs that Patel sold to him. We disagree. Although Urbani gave conflicting testimony on whether he had a prescription for clonazepam, "[t]estimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "To be incredible, [testimony] must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." *Burke v. Scott*, 192 Va. 16, 23 (1951). If Patel had offered evidence establishing that Urbani had valid prescriptions for the drugs that Patel sold to him, that is a method by which Urbani's testimony could have been rendered incredible as a matter of law. Yet Patel offered no such evidence.[8] Thus, "[p]otential inconsistencies in [Urbani's] testimony [were to be] resolved by the fact finder." *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011).

---

[8] Patel laments that "if the prosecution and defense had Patel's database of on-file prescriptions on his hard-drive, Patel could have presented that evidence in his defense." But the issue of the propriety of the DEA's actions and the circuit court's decision not to compel the Commonwealth to turn over the hard drives is not before us in this appeal.

We disagree with Patel's contention that, because Urbani's PMP report only showed prescriptions that were filled and not those originally issued to him, the evidence was insufficient as a matter of law to convict Patel. Viewed in the light most favorable to the Commonwealth, Urbani's PMP report corroborated Urbani's testimony that he did not have prescriptions for the drugs that Patel sold to him. If Urbani did in fact have prescriptions for these drugs, Patel was required by law to update Urbani's data in the PMP system every time he sold drugs to Urbani. Since Urbani's PMP report did not show that he had ever filled prescriptions for oxymorphone, clonazepam, methadone, or buprenorphine/naloxone, the jury could have reasonably inferred that Patel—a licensed pharmacist who should have known the proper procedures for filling prescriptions—sold the drugs to Urbani without a valid prescription. This inference is only further supported by Patel's suspicious behavior during the controlled drug purchases, including his insistence that he and Urbani communicate through written notes, and his failure to follow other statutory and regulatory requirements by selling drugs to Urbani in unlabeled pill bottles and mixing different pills together in the same bottle.

In sum, the evidence offered by the Commonwealth to establish that Urbani did not have prescriptions for the drugs Patel sold to him was not incredible as a matter of law. When viewed in the light most favorable to the Commonwealth, the evidence was sufficient for the jury to find that Urbani did not have prescriptions for the drugs that Patel sold to him. Thus, the circuit court did not err in overruling Patel's motion to strike.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed*.